In re Ewell E. MELANCON and Suzonne
W. Melancon, Debtors.

LA CAPITOL FEDERAL CREDIT
UNION, Plaintiff,

v.

Ewell E. MELANCON, Jr. and Suzonne
W. Melancon, Defendants.

Bankruptcy No. 95–10104.
Adversary No. 95–1037.

United States Bankruptcy Court,
M.D. Louisiana.

July 31, 1998.

Charles N. Malone, Baton Rouge, LA, for plaintiff.

Robert H. Harrison, Denham Springs, LA, for defendants.

## RULING

LOUIS M. PHILLIPS, Bankruptcy Judge.

In this adversary proceeding, LA Capitol Federal Credit Union (LA Cap) asks this court to determine whether two debts owed it by the defendants, Ewell Earl Melancon, Jr. and Suzonne Wright Melancon (debtors), are excepted from discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (B). For the following reasons, the court rules that one of the debts is dischargeable, while the other is not.

### Jurisdiction

This court has jurisdiction over the proceeding and has statutory authority to issue a final ruling. 28 U.S.C. §§ 157(a), 157(b)(2)(I), 1334(b).

### Facts

At all relevant times, debtors were husband and wife, living in a community property regime created by Louisiana law. Mrs. Melancon was a loan officer at a local bank, with extensive experience in financial matters. Mr. Melancon worked for the Louisiana Department of Environmental Quality in a supervisory capacity. Defense Exhibit 2.

Mrs. Melancon was a compulsive gambler. She financed her habit with cash advances obtained through use of various credit cards, including a LA Cap Visa card with a $7500 credit limit, which was issued by LA Cap on November 5, 1992 (the LA Cap Visa).[1] Plaintiff's Exhibits 4, 8. In November 1993, on account of Mrs. Melancon's having run up extensive credit card-related debts as a result of expenditures used to fund gambling activities and absorbed by gambling losses, the debtors borrowed $21,200 from Sunburst Bank, then Mrs. Melancon's employer, to reduce the outstanding balances on their credit cards. They secured the loan with a second mortgage on the family home. The debtors used a part of the proceeds from this loan to pay the entire balance due on the LA Cap Visa account. Plaintiff's Exhibits 2, 4.

Mrs. Melancon did not use the Visa between November 1993 and May 1994. Plaintiff's Exhibit 4. By the end of May, she had reached or exceeded the credit limit on her other credit cards, so she started using the LA Cap Visa again. Between June 6th and July 17th, Mrs. Melancon used the Visa to obtain 28 cash advances totaling $7889. Plaintiff's Exhibit 4. All of these cash advances were used for gambling. Mrs. Melancon did not use the Visa after July 17, 1994, because she had exceeded the card's credit limit. By the time they filed their petition in January 1995, the debtors had amassed over $35,000 in new credit card debt, virtually all of which represented Mrs. Melancon's gambling losses.[2] During the years 1993 and 1994, Mrs. Melancon suffered over $60,000 in gambling losses.

On August 16, 1994, Mr. Melancon applied to LA Cap by telephone for a $5000 loan on a revolving line of credit. Pat May, the loan originator for LA Cap, retrieved information regarding the debtors' prior account history and financial status from her computer, and asked Mr. Melancon to verify that information. Mr. Melancon indicated that LA Cap's information was accurate. He did not disclose the additional debts that the debtors had incurred in the past year, which included the debt secured by the second mortgage on the house and over $25,000 in credit card debt. Mr. Melancon stated that the reason for the loan was to finance the purchase of an automobile. The record indicates that on August 19, 1994, Brian and Nicole Melancon (presumably the debtors' son and his wife) purchased a new Toyota Celica, and Nicole wrote a check on that date for $5970. Three days later, on August 22, Brian and Nicole

---

1. The Visa initially had a $3000 credit limit. In October 1993, LA Cap increased the limit to $7500.

2. On May 15, 1994, the debtors used the LA Cap Visa to buy goods with a total value of $118.35 at Brooks Fashions. The remainder of the charges are all cash advances apparently used by Mrs. Melancon for gambling.

deposited a $5000 check into their account. See Defense Exhibits 3, 4, 5. There was testimony that the $5000 check came from the debtors, and that it represented the proceeds from Mr. Melancon's loan.

Katherine Lemelle, the loan officer who approved the loan, informed Mr. Melancon that the balance on the Visa was over $8000, and that his request could not be granted until the balance was brought below the $7500 credit limit. Mr. Melancon made a $510 payment on the Visa account. LA Cap then approved the loan. Ms. Lemelle testified that she would not have approved the loan if she had known of the omitted debts or the second mortgage.

The Melancons made their last payment on the LA Cap Visa account on November 3, 1994. The payment was in the amount of $266. The payments made on the account during 1994 totaled $1261.79. In January 1995, the Melancons filed a petition in this court Chapter 7 of the Bankruptcy Code. This adversary proceeding followed. LA Cap alleges that Mrs. Melancon committed fraud when she took the cash advances with neither the intent nor the ability to pay for them, and that Mr. Melancon committed fraud by intentionally deceiving LA Cap concerning the family's financial condition and the purpose of the $5000 loan.

### Law; Discussion

With this ruling we throw our analytical hat into the ring regarding exception of debts from discharge under § 523(a)(2)(A) within the realm of the credit card, gambling and other types of purchases, the cash machine (in and out of gambling houses), the subjective/objective dichotomy, the Restatement of Torts (Second), etc., etc., etc. We wish to state, by way of introduction, before we cast ourselves among the vast expanse of expressions of our peers, that we sat down and read 251 opinions (all published since 1980) concerning the dischargeability of cred-

it card debts under § 523(a)(2)(A), to make sure that we understood the various approaches to what has proven to be a vexing array of subjects (usually within the confines of "credit card debt" or "gambling and credit card debt"). We are grateful to our colleagues for the extensive guidance they have provided (less grateful for how tired we are after reading all their words). We, like those who have written before us, are convinced of the correctness of the approach we have chosen, though, as best we can tell, it differs (perhaps only in number and depth of wrinkles) from those who have preceded.

### The Statute

LA Cap seeks relief against Mrs. Melancon under § 523(a)(2)(A).[3] That statute provides that a debt is excepted from discharge if the debt was incurred through false pretenses, a false representation, or actual fraud. None of these terms is defined in the Bankruptcy Code. The court must therefore look to the jurisprudence for guidance. We start at the top.

### Field v. Mans

The United States Supreme Court, in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), directed that the terms "false pretenses, a false representation, or actual fraud" should be given their ordinary common law meanings. 516 U.S. at 69–70, 116 S.Ct. at 443. As it happens, Louisiana follows the Continental legal tradition, rather than the Anglo–American common law. Since Louisiana doesn't have a common law of torts, a question arises: What version of tort law should this court use as guidance? The *Mans* Court also answered this question, directing lower courts to look at the Restatement (Second) of Torts (the Restatement). "We construe the terms in § 523(a)(2)(A) to incorporate the general common law of torts, the dominant consensus of common-law jurisdictions, rather than the law of any particular State." *Id.* at 70 n. 9, 116 S.Ct. at 443 n. 9

---

**3.** Throughout this opinion, citations to statutes refer to those found in the Bankruptcy Code, Title 11 U.S.C., unless otherwise indicated. Section 523(a)(2)(A) provides, in relevant detail:

A discharge under section 727 ... does not discharge an individual debtor from any debt—

for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

(citations omitted). "The most widely accepted distillation of the common law of torts [is] the Restatement (Second) of Torts (1976)." *Id.* at 70, 116 S.Ct. at 443–44. This Judge was trained in the Continental Legal Tradition, and was imbued by a number of his law school professors with the notion that the Anglo–American common law constituted an infirm mishmash of unprincipled verbiage, fit perhaps for providing the rule of law for tribes of icemen extinguished by the Ice Age, and best left encased with them in some deep undisturbed cavern back there. Because of this training (the civilian tradition is synonymous with "civilization"), *Field v. Mans* left this Court with much work to do, that is, we had to read the "fraud portion" of the Restatement, all of it (including comments, reporter's notes, cases cited by reporters, law review commentary, etc.), and after that we had to do it again.

What we found has revealed a tradition of jurisprudence concerned with hashing out the interplay among the various components of the civil fraud action, and has illuminated our path, throwing light (harsh and white, revealing flaws to the core) upon the various approaches taken by bankruptcy courts to the unraveling of the action for fraud. What we have found is that the Supreme Court, in *Field v. Mans*, did our courts a favor; it gave us, in essence, a code to follow. This should have restricted the field of analysis at least to the extent that bankruptcy courts realized that they were far from the "cutting edge," that they are charged with following the delineated tradition (in Restatement form). Probably, the effect has not been what we believe to have been intended, though perhaps the fault is to be found in the all too quickly reached limit of this Court's analytical/intellectual/imaginative capability (or is it capacity?); this limit (always too close in front of us) is perhaps what precludes us from comprehending the leaps taken by other courts, usually (but not always) with a resultant judgment in favor of the debtor.

One last thing (before we start). Congress is presently cogitating over an array of pending legislation, much of it to do with curbing perceived (by someone or some group) consumer bankruptcy abuse. The bankruptcy (sans creditor) community has roundly criticized most of the stuff being thrown about in Congress, as being too creditor-oriented, and as addressing problems which do not exist. The consumer lending lobby is booed for its attempt to purchase legislation designed to make debtors pay (and pay and pay), etc., either through restricted access to bankruptcy or expansion of nondischargeability (if you can clear the 613 statutory hurdles to even getting in the Chapter 7 arena that are presently under consideration). We agree that the problems sought to be addressed are illusory, under the Code and most controlling jurisprudence. However, there is a part of us that believes bankruptcy judges (and even some judges up the ladder—although we have not understood them to be participants in the outcry) have, to a certain extent, become estopped from complaining, due to certain of the approaches to the question of dischargeability of credit card debt on the basis of fraud. What we are offering is an approach which, we think, follows the directive of the Supreme Court and utilizes the Restatement as it exists. Also, and we think this is somewhat important, we think that while our approach follows the law, giving both sides the rights and imposing the obligations thereby required, it will never be twisted, by sound bite people lobbying Congress, into an anthem for "reform" such as:

> The law needs revision because as it stands a person utterly broke can borrow money *AT A CASINO,* spend it all on gambling and walk away from the debt by telling a(any) judge that they *believed* or *hoped* they would WIN! This places an unconscionable burden on those who pay their debts. They (You) are paying so judges can let wastrels go because they hoped to win!

Unfortunately, there are some courts whose opinions do stand for this ridiculous proposition, without the slightest lobbyist's recasting. We think that the Code and the Restatement provide a measured, historically grounded analytical field, applicable to the credit card transaction, that if applied and noted would ground much of the sound bite legal and legislative thought being bandied about lately. We are gratified that it turned out this way, that Congress wasn't so foolish

as to softheadedly promulgate a law allowing exculpation on the basis of mere statements of belief or hope, or on the basis of a particular bankruptcy court's divinely inspired goal of rectifying the modern practice of lending to people who (in the inspired opinions of the inspired observers) should not be borrowing in the first place. We begin.

### The Restatement

There is no mention in the Restatement of false pretenses, false representation, or actual fraud.[4] The only tort that could properly be characterized as "fraud" is called "fraudulent misrepresentation," and is modeled on the common law tort of deceit. Since the

*Mans* Court relied upon this tort of fraudulent misrepresentation to determine the issue before it, this court concludes that it should apply the same standard in any action under § 523(a)(2)(A), despite the fact that the Restatement's terminology differs from that found in the Bankruptcy Code. Restatement (Second) of Torts (1976) §§ 525–549.[5]

Section 525 of the Restatement provides:

One who fraudulently makes a misrepresentation of fact, opinion, intention, or law for the purpose of inducing another to act or to refrain from action in reliance upon

4. At least three courts have undertaken the difficult task of trying to find distinctions among these terms.

In *Matter of Schnore*, 13 B.R. 249, 251 (W.D.Wis.1981), the court suggested a "plausible distinction," between false representations and false pretenses might be that false representation referred to an express misrepresentation, while "false pretenses" referred to "implied misrepresentations or conduct intended to create a false impression." In support of its distinction, the court cited the dissenting opinion in *Davison–Paxon Co. v. Caldwell*, 115 F.2d 189 (5th Cir. 1940), a Fifth Circuit case under the old Bankruptcy Act, which will be extensively discussed below. This distinction has been rendered meaningless by the Supreme Court's decision in *Mans*. The Court directed lower courts to turn to the Restatement of Torts for guidance concerning the elements of fraud, and the Restatement makes no distinction between express misrepresentations and implied ones (or conduct asserting the existence of a fact that does not exist), lumping them together as "misrepresentations."

*In re Etto*, 210 B.R. 734, 739 (Bankr.N.D.Ohio 1997) adopted the *Schnore* distinction for false representations/pretenses, and also tried to distinguish both of them from actual fraud. According to *Etto*, actual fraud is a deception that successfully induces another to part with property or surrender a legal right. Is there a difference between a "deception" and a "fraudulent misrepresentation," which the Restatement defines (paraphrasing) as "words or conduct asserting facts which do not exist"? If so, I don't see it. Is there a difference between "successfully inducing another to part with" something valuable, on the one hand, and the Restatement's requirements of justifiable reliance, causation, and damage? If so, I don't see it.

*In re Hernandez*, 208 B.R. 872 (Bankr.W.D.Tex. 1997) treated false representations and false pretenses as identical, but purported to distinguish them from actual fraud. According to *Hernandez*, a false representation/pretense was a "knowing and fraudulent falsehood ... describing past or current facts." On the other(?) hand, actual

fraud consisted of a representation that the maker knew to be false, which was made with the intent to deceive the other party. This court sees no distinction between a knowing and fraudulent falsehood, on the one hand, and a falsehood that is knowing and fraudulent, on the other. The court has also seen several opinions that suggest (or assert) that fraud can exist without a representation of any kind. See, e.g., *In re Shanahan*, 151 B.R. 44 (Bankr.W.D.N.Y.1993).

Given the broad definition of "misrepresentation" found in the Restatement, this court has been unable to think of a single scenario that could be characterized as fraud, and yet not involve a misrepresentation. What is the definition of "misrepresentation"? Doesn't it include, in certain situations, omissions? The very word "fraud" indicates some sort of deception or trick.

How can a victim be deceived or tricked without words or conduct asserting the existence of a fact? Doesn't *Field v. Mans* address this possibility, i.e., if you represent, you can misrepresent—I think the property is lien-free, or something; if you do not represent, you do not commit fraud. However, depending upon the relationship between the parties, isn't omission of material fact the same as fraudulent misrepresentation? See Restatement §§ 550–551.

5. The difference in terminology may be due to the fact that *Mans* was the first indication that the Restatement would govern actions under § 523(a)(2)(A). Certainly the lower courts applying the statute were taken off guard. Of the 248 opinions published since 1978 that concern dischargeability of credit card debt, only 26 cite the Restatement of Torts. Of these 26, only 2 predate *Mans*. Given these statistics, and given the Supreme Court's directive that the Restatement must guide a court's inquiry into fraud, it is clear that *Mans* changed the law applicable to dischargeability actions under § 523(a)(2)(A), or at least the source of that law, or at least attempted to provide a wake-up call to all courts that there in fact *is a law* that should be applied.

it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.

Restatement § 525. This statement of law may be viewed as a cause of action with four elements. They are 1) fraudulent misrepresentation 2) justifiable reliance 3) causation 4) damage. The party seeking to except a debt from discharge must establish the existence of each of these elements by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

### Fraudulent Misrepresentation

The first element of the tort of fraudulent misrepresentation is, predictably, the existence of a fraudulent misrepresentation. Simply by looking at the words "fraudulent misrepresentation," one can see that a fraudulent misrepresentation has three components. Starting from the back and moving forward, we see that there must be a representation, it must be false (mis-), and it must be fraudulent. We will examine these components in turn, beginning with the most basic: does the use of a credit card constitute a representation of anything?

The Restatement bases its action for fraudulent misrepresentation on the common law tort of deceit.[6] The tort of deceit can be traced back for centuries, and is based upon the old English writ of deceit. In stark contrast, the widespread use of credit cards is a phenomenon of the past twenty years, one that has arisen since the drafting of the Bankruptcy Code. Commercial innovations often outpace commercial law. That may be the case here. It is certain that bankruptcy courts have had a difficult time applying the venerable law of deceit to the relatively new use of credit cards.

The debtors take the position that the use of a credit card to obtain a cash advance can never be fraudulent because there is no representation. LA Cap, on the other hand, argues that each use of the Visa to obtain a cash advance was a representation that Mrs. Melancon had both the intent to repay and the ability to realize that intention. Both of these positions (and others) are well-supported by authority.[7] Rather than sort through the jurisprudence to determine which case, if any, has hit upon the correct approach (or pieces of the correct approach), this court will take its cues from the Supreme Court and turn to the Restatement to learn what the general common law has to say on the subject.[8]

The Restatement does not define "representation." However, it defines "misrepresentation" as follows:

> "Misrepresentation" is used in this Restatement to denote not only words spoken or written but also any other conduct that amounts to an assertion not in accordance

---

6. The original Restatement of Torts (1938) called the tort with which we are concerned "deceit" rather than "fraudulent misrepresentation," and "deceit" is maintained as a subtitle in the current Restatement. The actual definition of "misrepresentation" and the elements of the tort of fraudulent misrepresentation did not change from the original Restatement (1938) to the Restatement (Second).

7. See, e.g., *In re Etto,* 210 B.R. 734 (Bankr. N.D.Ohio 1997); *In re McDaniel,* 202 B.R. 74 (Bankr.N.D.Tex.1996); *In re Alvi,* 191 B.R. 724 (Bankr.N.D.Ill.1996); and *In re Landen,* 95 B.R. 826 (Bankr.M.D.Fla.1989), all holding that the use of a credit card is not a representation of anything; *In re Kitzmiller,* 206 B.R. 424 (Bankr. N.D.W.Va.1997); *In re Valdes,* 188 B.R. 533 (Bankr.D.Md.1995); and *Matter of Janecek,* 183 B.R. 571 (Bankr.D.Neb.1995), all stating that the representation of intent to pay is an "implied representation," by which they meant that the representation is not real, but is a necessary legal fiction designed to prevent fraud; *In re Peterson,* 182 B.R. 877 (Bankr.N.D.Okla.1995) (also saying that we are dealing with an "implied representation," but concluding that the representation of intent to pay is not a fiction, but is an actual representation inferred from the circumstances of the transaction); *In re Homschek,* 216 B.R. 748 (Bankr.M.D.Pa.1998) (use of a credit card is a representation of intent to pay, but not ability to pay); *In re Berz,* 173 B.R. 159 (Bankr.N.D.Ill. 1994) (use of a credit card implies intent to pay, ability to pay, and reasonable reliance on part of card issuer); *In re Parker,* 59 B.R. 721 (Bankr. D.Mass.1986); (use of a credit card constitutes an actual representation of ability to pay as well as intent to pay).

8. This court is free to do so because no controlling opinions have been published in this circuit since the publication of *Mans,* and, as previously mentioned, that opinion changed the law governing actions under § 523(a)(2)(A).

with the truth. Thus, words or conduct asserting the existence of a fact constitute a misrepresentation if the fact does not exist.

Restatement § 525, comment (b). If words or conduct asserting the existence of a fact constitute a misrepresentation when the fact does not exist (and therefore the assertion is false), then a "representation" must be "words or conduct asserting the existence of a fact." It is unlikely that a person taking a cash advance from an ATM talks to the machine. If the person does say something, the machine probably doesn't listen. So we will assume that our concern is with "conduct asserting the existence of a fact," rather than "words ... asserting the existence of a fact."

### The Credit Card—What Happens?

█ What is the conduct involved in obtaining a cash advance, and what facts, if any, are asserted by that conduct? The holder places a card into an ATM, pushes some buttons, removes cash from the machine, obtains a receipt, and retrieves the card. When viewed independently, these actions do not appear to assert any facts beyond the scope of the actions themselves. However, the actions do not take place independently. They take place within the context of a pre-arranged agreement between the issuer and the holder.

The key to understanding the credit card agreement is the realization that a credit card is designed to facilitate commerce. The credit card, when viewed with a commercial eye, is a thoroughly useful innovation. It allows the holder to make purchases that could not otherwise be made, and to obtain cash quickly, without the need for paperwork or interviews. For this convenience, the

holder pays interest and fees to the issuer. The card also allows retailers to sell goods or services to consumers who lack ready cash, thereby boosting sales and, presumably, profits. For this benefit the retailer pays a percentage of credit card receipts to the operators of the card system. The issuers and system operators profit directly.

While the credit card is a great facilitator of commercial transactions, it is not truly a medium of exchange. Payment must eventually be made. In the case of a sale, the issuer must pay the retailer for the goods or services that the consumer has bought, and eventually the consumer must repay the issuer. Cash advances must also be repaid with the customary check or money order. If an issuer fails to pay the retailer for a purchase, the retailer undoubtedly has recourse against the holder, who is the buyer of the merchandise. After all, the holder obtains the goods without payment. The consideration (to use a non-civilian[9] term) for the sale is, by mutual arrangement, the payment forthcoming from the issuer. If that consideration fails, the buyer must either return the item or arrange another form of payment. A sale, even if it involves a credit card, is a sale.

For cash advances, a similar analysis can be used. Through prior arrangement, the issuer establishes, for the benefit of the holder, a line of credit that can be reached at any time through the use of the credit card. While the mechanical aspects of the transaction have been altered through the introduction of the card, this is still a loan against a line of credit. The consideration for the loan is the borrower's promise that the money will be repaid at a future date, usually with interest.[10]

---

9. The Louisiana law of sales is based upon the Continental, or civilian, model. That model does not recognize consideration as a concept of contract law. Instead, Louisiana uses a more flexible, easier to satisfy standard called "cause." See, e.g. Louisiana Civil Code Articles 1966–69 (West 1995). Since we are dealing here with the distillation of American law as embodied in the Restatement, it seems more appropriate to talk about the general American contract law than the legal peculiarities of a Louisiana transaction.

10. Seen in this light, the difficulty some have in finding any representation within the use of a credit card for cash advances is somewhat befuddling. Doubtless, these same courts would have no trouble finding a representation to repay a draw upon a previously arranged line of credit by a contractor from, say, a bank. The line of credit is set up pursuant to a loan agreement. When a draw is needed, either a phone call is made or there is a draw request. According to the line of credit agreement, obtaining a draw is the obtaining of a loan. A loan is a contract. A contract is a made-up mutual agreement. Inher-

Earlier, we stated that the key to understanding the significance of the holder's use of the credit card to obtain a cash advance was to be found in the credit card agreement. Given our observation that the nature of the underlying transaction is not altered by the presence of the credit card, what significance does the credit card agreement play in our analysis?

The credit card agreement is properly viewed as a contractual arrangement that alters the mechanical aspects of future contracts among the parties involved. The agreement establishes rules that are understood by the participants, i.e., the retailer, the holder, the issuer, and the system operators, to govern all sales and loans that are facilitated by use of the card. The agreement is a contract that anticipates and is designed to govern future contracts. Absent the holder's decision to use the card, the agreement requires little or no performance on the part of any party. Upon the holder's use of the card to facilitate a loan or sale, the rules inherent in the credit card agreement[11] become operable.[12]

We've already seen one example of this phenomenon: the credit card sale. As we've previously stated, the sale is still a sale, even though the consumer uses a credit card rather than cash. It is important to note that the consumer is not required, contractually or legally, to use the card. The initial decision to invoke the terms of the agreement is completely within his power. Once the consumer decides to use the card, a series of interconnected contracts is called into play. The retailer accepts the credit card rather than present payment in negotiable currency because he has an agreement with the network operator that requires him to do so, and because he knows that the issuer will pay for the items at some later date. The issuer pays for the merchandise because it has an agreement with the holder that it will pay for any items that the holder acquires

---

ent in offer and acceptance is the agreement to be bound for the obligations running in favor of the other. Agreeing to be bound is synonymous with agreeing to fulfill. Within the loan context, an agreement to fulfill is a promise to repay. A promise is a representation. We do not understand the difficulty (unless it is too simple and therefore proper fodder only for minds as simple as ours), in application of this general analytical grid to the cash advance on a credit card transaction.

11. We use the phrase "inherent in the credit card agreement" because we wish to draw attention to the fact that the agreement is not necessarily limited to the written document that accompanies the issuance of the card, which is drafted by the issuer and is often ignored by the holder. We are concerned here with the nature of the credit card system itself, and the inherent components of that system that allow it to serve its purpose as a facilitator of commerce. However, there are pieces of paper that come with credit cards that say, at the top, such things as "Credit Card Agreement." etc.

12. We are mindful of an opinion out of the Fifth Circuit that dealt, through the prism of an action under § 544(b) of the Bankruptcy Code and Articles 2036, et. seq. of the Louisiana Civil Code, with the question of whether the original credit card agreement constitutes an antecedent debt for the purposes of establishing an unsecured creditor who could have avoided a transfer under state law. See Traina v. Whitney National Bank, 109 F.3d 244 (5th Cir.1997). In Traina, the court says that because as of the date of the transfer sought to be avoided there was nothing owed on the credit card (the balance having been paid off prior to the transfer), the credit card holder, whose balance grew after the transfer, could not constitute a creditor holding an allowed claim who could have avoided the transfer under applicable non-bankruptcy law. Along the way, the court makes the remarkable (and utterly incorrect) assertion that "[n]o obligation existed until Imperial charged transactions to the individual credit accounts" (Id. at 247), which is the same thing as saying, in Louisiana law terms, that there was no contract ("a contract is an agreement by two or more parties whereby obligations are created, modified or extinguished." La. Civ.Code Art.1906). Notwithstanding its conclusion that, for purposes of § 544(b) and La. Civ.Code Art.2036, the original credit card agreement does not entail obligations on the part of the parties to it (we think this is wrong), the court finds that the borrower incurred obligations by means of making charges on the card, which is the exact same thing as saying that by making charges on the card the borrower in incurring the obligation agreed/promised to repay the amount borrowed. Regarding the initial agreement, we consider the Fifth Circuit pronouncements dicta, or at least limited to the question of whether the original credit card agreement can constitute an "obligation" sufficient to provide a basis for avoiding a subsequent transfer, undertaken at a moment there was *no money due on account of use of the card*. We agree that by using a credit card to obtain cash advances one incurs an obligation (by making a promise that is accepted).

through use of its card. For his part, the holder knows that he can acquire the goods without paying for them now, but that he will have to pay the issuer later. This rather complicated legal and contractual situation is not at all complicated in practice. The holder presents his card, the cashier verifies that the card is valid and that it provides suffi-·cient credit for the transaction, and the holder signs a sales slip. The entire process is often conducted without oral communication (depending on the moods and personalities involved), and generally takes less than a minute (exclusive of line-waiting time). Nevertheless, the speed and fluidity of the transaction (which are by design, and form the primary motivation for the invention of the credit card) do not alter the fact that this sale carries substantial legal consequences, all of which derive from the various interconnected contractual relationships.

In the case of the credit card loan, or cash advance, there is no retailer, but the principles of speed and simplification are still present. By prior arrangement, the issuer agrees that it will supply the card holder with cash upon his request, provided that the request does not exceed his available credit. By prior arrangement between the issuer and the network operator, the operator agrees to honor the requests for cash made by any of the issuer's cardholders at any ATM in the operator's network,[13] provided that a computerized verification reveals that the card is valid and supplies sufficient credit for the transaction. For his part, the card holder initially promises nothing other than to abide by the terms of the agreement. He doesn't agree. to borrow any money, and he isn't bound to do so. Before the use of the ATM, there is no loan, and therefore no promise to repay that particular loan. The use of the ATM to obtain money is, by prior arrangement, a request for a loan (which automatically includes a promise to repay) and, unless the ATM's programming dictates otherwise, approval of that request. Any obligation to repay that the holder may owe (other than the irrelevant and virtually obsolete membership fee) is contingent upon his use of the card. Another way of looking at this is that without a promise to repay, there is no loan contract, no mutuality of obligation. No one, even those who have found it so difficult to find a promise, could believe that the money that comes out of the ATM is free. Would they?

The credit card agreement, then, can be viewed as a contract that sets forth certain agreed terms for future contracts that are contemplated by the parties. If a credit card holder decides to exercise his rights under the agreement and borrow some money, he can do so without waiting for bank approval, and without paperwork. He simply goes to the nearest ATM, puts in his card, pushes a few buttons, and takes his cash.

But a loan is still a loan. Just as in the case of the credit card sale, the credit card may have served to streamline certain technical aspects of the transaction, but it has done nothing to alter the essential legal components. When the card holder inserts the card into an ATM, he is, in one step, asking for a loan and promising to repay it if it is obtained (now we may have become redundant; a loan agreement *is* the promise to repay, though perhaps the pounding of the buttons can be seen as two distinct things, the loan request and the finalization of the actual loan). When the computer verifies that the card is valid, and that the transaction will not exceed the card's credit limit, it, on behalf of the issuer, is approving the loan. Inherent in any request for a loan, in any making of a loan by two parties, is a promise by the borrower to repay the money borrowed. This is no legal fiction. It is just as real a promise as the one made whenever someone turns to a friend and asks "Can I borrow five bucks?" Even if he doesn't add "I'll pay you back," that promise is made by means of the use by the requesting party of the word "borrow." When a card holder puts a credit card into an ATM, he is, through the miracle of modern technology, asking the issuer (invariably a corporation (not a real person), operating only through agents, whether human or inani-

---

**13.** If the request is made at an ATM operated by the issuer, the network may have no involve- ment, but this is irrelevant to our analysis.

mate, and never face to face) "Can I *borrow* some money?" (According to the terms of the prearranged or already arranged credit card relationship grounded in the credit card agreement—this separates the cash advance transaction from the street corner verbal request—"Can I borrow five bucks?" If the answer, within the street corner transaction, is, simply, yes there may be some problems figuring out such things as interest rate, due date, etc., that were not present within the credit card context.) Inherent in the question is a promise to repay the money at some future date.

So, even though the card holder doesn't come out and say "I promise I'll pay the money back" while he's standing at the teller machine, he does makes a promise. Some courts have gone to a great deal of trouble to determine whether this promise is real or fictional, express or implied. The reason these courts ask the question is maybe because of the holding in the pre-Code Fifth Circuit case of *Davison–Paxon Co. v. Caldwell*, 115 F.2d 189 (5th Cir.1940), *cert. denied* 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941), (or maybe because of the rationale running through it which could easily be adopted by a court wishing to squelch the proposition that use of a credit card carries with it a representation), in which the court held that only an overt, express representation was actionable under the Bankruptcy Act of 1898. A brief discussion of that case is necessary to demonstrate both its incorrectness and its inapplicability to the case before the court.

### Davison–Paxon; Gone, Gone, and Wrong (or, is it Wrong, Gone, and Gone?)

Lisabeth Caldwell was a regular customer of the Davison–Paxon Company, and she ran up several hundred dollars in credit charges at the store between September 1936 and the end of 1938. In February 1939, Davison–Paxon sued Caldwell on that debt in municipal court in Atlanta. Her response was to file for relief under the Bankruptcy Act. Despite that fact, and despite the fact that

Caldwell sought a stay of the state court action pending resolution of her bankruptcy case, the state court issued a judgment against Caldwell for $320.88. *Davison–Paxon*, 115 F.2d at 190. Caldwell received a discharge of all debts "excepting such debts as are by law excepted from the operation of a discharge in bankruptcy." *Id.*

Shortly after Caldwell received her discharge, Davison–Paxon garnished her wages through a state court action. In July 1939, Caldwell returned to the bankruptcy court to enjoin the garnishment. The issue was whether the debt that Caldwell owed to Davison–Paxon was excepted from discharge under § 17(a)(2) of the Act as a "liability for obtaining money or property by false pretenses or false representations."

According to the company, the debtor had promised to pay for the goods, and her conduct was effectively a representation of her ability to pay and intent to pay. Despite these representations, Caldwell knew that she was insolvent, and she never intended to pay for anything. Therefore, since the debtor had falsely represented her intent and ability to pay, her debt to Davison–Paxon was excepted from discharge.

The court disagreed, stating that while such behavior might be deceitful, it was not sufficient to except a debt from discharge. According to the court, § 17(a)(2) required a false representation or false pretenses, and, contrary to Davison–Paxon's suggestion, there had been no representation or pretense in the transactions. The court held that the statute excepted only "actual overt false pretense[s] or representation[s]." *Id.*, at 191. (What is an actual overt false pretense?) According to the court, there were other ways to commit fraud than false representations or pretenses, and while the facts, if they were as the creditor presented them, might establish fraud, they did not establish the existence of a false pretense or a false representation. Therefore, the court affirmed the district court's issuance of the injunction.[14]

---

14. Recall that the Act did except from discharge debts arising from fraud while acting as a fiduciary. Bankruptcy Act of 1898 § 17(a)(4). This positing of fraud within another section of non-dischargeability provided the court with the rather superficial suggestion that actual fraud (which might exist without actual overt representations or pretenses, according to the court) was exclud-

In dissent, Judge Sibley pointed out that the general practice was to hold people liable for false representations, even when they hadn't actually said anything. He included several examples, such as "One who sells property knowing [it] is not his ... by offering to sell has impliedly represented that it was his. *Reg. v. Samson*, 52 L.T.Rep., N.S. 772." 115 F.2d at 192. Similarly, "[w]hen a little girl bought goods to the amount of twenty-five cents and tendered in payment a twenty dollar gold piece which she thought was a dollar, and the merchant, perceiving the mistake, gave her change for a dollar, saying nothing, he was a cheat and a swindler. *Jones v. State*, 97 Ga. 430, 25 S.E. 319, 54 Am.St.Rep. 433." *Id.* These citations show that it has long been recognized that a wrong-doer can commit fraud without opening his mouth. The majority opinion had stated as much, but Judge Sibley argued that the majority was in error when it failed to distinguish between false representations and false pretenses. According to Judge Sibley, it might be appropriate to hold that a false representation had to be express and overt, but that a false pretense, contrary to the stance taken by the majority, could not be express and overt. Rather, " '[f]alse pretenses' more appropriately refer to implied representations, or conduct intended to create and foster a false impression. In both cases of course an intended deceit is essential. In either a discharge is made ineffectual." 115 F.2d at 193.

Judge Sibley is right. *Davison–Paxon* was wrongly decided. There were two fundamental flaws in the majority's approach. First, it treated the terms "false representations" and "false pretenses" as identical. Such a treatment violates one of the basic rules of statutory construction, which is that all of the terms of a statute should be given meaning. If "false representations" is taken

to mean, rightly or wrongly, "words that create a false impression," then "false pretenses" must mean something else. The only reasonable definition for "false pretenses" under the circumstances is "conduct that creates a false impression." The majority conceded that Caldwell's conduct, if it was as the creditor asserted, was deceitful. 115 F.2d at 191. Its failure to give the phrase "false pretenses" any independent meaning allowed the court to conclude that fraudulent conduct was not enough to trigger applicability of § 17(a)(2)'s exception from discharge. Second, the majority assumed that because the word "fraud" was contained in § 17(a)(4) of the Act, but was not found in § 17(a)(2), there must have been a legislative intention to somehow limit the § 17(a)(2) action.[15]

The majority is correct that Caldwell did not expressly state, through words formed and spoken by the interactive use of diaphragm, air, brain, larynx, tongue, lips, and teeth, an intention to pay for the goods she had obtained. But what of it? The Court presumed the existence of a credit *SALE*, that is, an agreement or contract whereby one party transfers ownership of goods to another in return for the agreement (promise) to pay for the goods at a later date (in accordance with specified terms, we guess). The court ignores, then, the fact that a fundamental component of the credit sale is the buyer's promise to pay the debt thus incurred, and that the debtor before it made such a promise to the seller of the goods. Without that promise, there is nothing to bind the debtor, and the creditor must be viewed as having given its merchandise away (the credit card company as having given its money away). It is a commonplace of contract law that promises may be conveyed by conduct. See Restatement (Second) of Contracts § 2. If, as the creditor asserted, Cald-

---

ed from those debts rendered nondischargeable by § 17(a)(2).

**15.** Recall that § 17(a)(4) dealt with fraud while acting as a fiduciary. There seems a perfectly reasonable explanation for including the term "fraud" in § 17(a)(4), and not mentioning it in (a)(2). While acting as a fiduciary, one can "defraud" the beneficiary through utilization of the position of fiduciary with no communication between the two parties at all. The claim for

"fraud" dealt with in § 17(a)(4) is not that on behalf of the person with whom the fiduciary deals, but rather that of the beneficiary, arising from the dealings of the fiduciary with another. "Fraud" seen in this light (as an intentional breach of fiduciary duty) need not involve any pretense or representation whatsoever between the bad actor and the party harmed. The *Davison–Paxon* court missed this, we think.

well had no intention to pay for the merchandise at the time she acquired it, then, as we shall see, that lack of intent was fraudulent, because she had (with conduct, perhaps, rather than words) misrepresented to the creditor her intent to pay for the merchandise. Despite the majority's contrary holding, this deception was the obtaining of property by false pretenses.[16]

While Judge Sibley's dissenting opinion carries the authority of logic, the majority's opinion carries the legally greater authority of having two votes in its favor. If *Davison–Paxon* were still relevant, it would be binding on this court, even though it is wrong. Fortunately, intervening circumstances have rendered the case completely irrelevant.

The first such circumstance is the enactment of the Bankruptcy Code in 1978. Section 17(a)(2) of the Bankruptcy Act of 1898 was replaced by § 523(a)(2)(A), which, as we have already mentioned, has three separate grounds for excepting a debt from discharge. They include, in addition to "false pretenses" and "false representations," "actual fraud." This addition of the phrase "actual fraud" as a ground for excepting a debt from discharge renders *Davison–Paxon* obsolete because the statutory rationale for the decision has been undermined. Recall that the majority opinion in that case was based on the (erroneous) position that while Caldwell's action may have been fraudulent, it did not involve false pretenses or false representations, and therefore did not fall within the ambit of § 17(a)(2). Now the "fraud" exception from discharge has been "broadened" to encompass all types of actual fraud.[17]

Earlier we recognized the existence of a maxim of statutory construction that directs that all parts of a statute should be given meaning. Now we are forced by circumstance (the circumstance being the rationale of *Davison–Paxon* ) to either accept the validity of *Davison–Paxon* 's holding or to make the same error that the majority in *Davison–Paxon* made by failing to give every word in a statute some independent meaning. This is true because § 523(a)(2)(A) lists three grounds for excepting a debt from discharge. If we are correct, and all cases of fraud involve either false pretenses or false representations, then the addition of the phrase "actual fraud" signifies nothing new, and the addition is superfluous.[18] On the other hand, if the phrase "actual fraud" has independent significance, then it must be true that an action can be fraudulent without involving false pretenses or false representations.

Wait. Maybe we have missed something. Maybe we are right, but "actual fraud" was placed in the statute for a reason other than to broaden the exception (thereby embracing *Davison–Paxon* ). An analysis of the legislative history underlying § 523(a)(2)(A) generates the plausible suggestion that by adding "actual fraud" Congress was not trying to undercut *Davison–Paxon* (maybe never having heard of it), but simply trying to make sure that the section was limited to actual as opposed to constructive fraud, actual bad conduct as opposed to fraud implied by law. See 124 Cong. Rec. H 11, 095–96 (daily ed. Sept. 28, 1978); S 17, 412–13 (daily ed. Oct. 6, 1978); Collier's 523.08[1][e] at 523–45; see

16. The original Restatement, having been promulgated before the *Davison–Paxon* decision, describes the tort of fraudulent misrepresentation in terms nearly synonymous with those found in the Restatement (Second). While *Field v. Mans* did not deal with the Act, it seems likely that the original Restatement contained the distillation of the common law sought to be expressed by § 17(a)(2) of the Act. This being so, the *Davison–Paxon* court is seen for this additional reason as having missed the interpretive boat.

17. We have already stated that we believe the previous exception to have been all-inclusive, since we cannot conceive of a case of actual fraud (excluding breaches of fiduciary duty, covered by § 523(a)(4)) that is not predicated on

either a false representation or false pretenses, especially in view of the common law of fraudulent misrepresentation which is the ground for the "fraud" exception. However, in *Davison–Paxon* the Fifth Circuit has asserted (without providing an example) that such a case does exist. Therefore, we are constrained to show that the conduct that does not exist is (even if we are wrong) now covered by the exception from discharge.

18. We do not consider actions (such as some breaches of fiduciary duty) that do not necessarily involve actual fraud, but are deemed to be fraudulent through adherence to a legal fiction. We do stress, however, that this is not such a case.

also *Neal v. Clark*, 95 U.S. 704, 24 L.Ed. 586 (1877). Probably the addition of "actual fraud," to make this clear, was unnecessary. It seems so, especially in light of *Mans*, which, in referring us to the Restatement, expressly precludes resort to "fraud implied in law" as a basis for exception from discharge.

However, for the courts in the Fifth Circuit (including those who believed either that Davison–Paxon was decided correctly or that the addition of "actual fraud" did in fact enlarge the scope of the statute—see *In re Holston*, 47 B.R. 103 (Bankr.M.D.La.1985)), the addition of "actual fraud" did mean something (even if it shouldn't have). The statutory underpinning for *Davison–Paxon* was gone. Therefore, so was the controlling effect of the case. We conclude that the new language is superfluous, and that it was probably added for no good reason. Even if we assume (as perhaps Congress did) that *Davison–Paxon* was correct in its statement that fraud was possible without a false pretense or false representation, that case is no longer the law, because now "actual fraud" is also covered by the exception.

The second reason that *Davison–Paxon* is no longer relevant is the Supreme Court's decision in *Field v. Mans*. There, while interpreting the same provision that we are examining, the Supreme Court decided that the case before it was governed by the "actual fraud" language that Congress added to the statute in 1978. To interpret the common-law meaning of this statute, the Court turned to the Restatement (Second) of Torts. As we stated earlier, there is no provision in the Restatement dealing with "actual fraud." The Supreme Court, when it examined "actual fraud," turned to Division Four of the Restatement, which is entitled "Misrepresentation." *Mans*, 516 U.S. at 70, 116 S.Ct. at 444.

The Restatement defines a misrepresentation as words or conduct asserting the existence of a fact which does not exist. The Supreme Court has directed that the legal standard that governs misrepresentation also governs "actual fraud." These facts, when considered together, lead to the following conclusions: At one time, the terms "false pretenses" and "false representations" may have meant two separate things (even if not to two circuit judges in this circuit). Perhaps, as Judge Sibley suggested in his dissent in *Davison–Paxon*, "false representations" referred to an express use of misleading words, while "false pretenses" meant conduct that created a false impression. Even if these two terms were distinguishable, the majority in *Davison–Paxon* treated them (we think incorrectly) as identical, thereby relegating debts obtained by false pretense to the dischargeable column—so that only overt, actually spoken "I promise to pay you in accordance with the agreement. I am hereby binding myself to and promising hereby to fulfill" representations could form the basis for nondischargeability under § 17(a)(2).

The two terms are merged together in the Restatement under the heading "fraudulent misrepresentation," and the definition of a misrepresentation includes both words and conduct. If there ever had been a distinction between false pretenses and false representations (we think there was), the Restatement eliminated it. By 1978, when Congress enacted the Bankruptcy Code, both terms had been replaced by "fraudulent misrepresentation." Regardless of what Congress intended the additional term "actual fraud" to mean, the Supreme Court in *Field v. Mans* told us what it really means: fraudulent misrepresentation, as set forth in the Restatement. The result is that we have three terms for the same tort, and any distinctions that were made prior to *Field v. Mans* are no longer relevant. All actions under § 523(a)(2)(A) should be governed by Division Four of the Restatement and by cases interpreting its provisions. *Davison–Paxon* predates the Restatement by 35 years, and *Field v. Mans* by 55 years. While the decision has never been formally overruled by the Fifth Circuit,[19] it is now obsolete, and is not relevant to this case.

---

**19.** We say "never been formally overruled" because the Fifth Circuit has clearly indicated, in two comparatively recent opinions, its dissatis-

faction with *Davison–Paxon*. In *Matter of Boydston*, 520 F.2d 1098, 1101 (5th Cir.1975) the court stated "The rationale underlying Davison–

### *What is A Promise? and the Futility of the Objective/Subjective Debate*

■ A long time ago, we stated that the use of a credit card to obtain a cash advance included with it a promise that the party obtaining the cash advance would pay the money back. Let's examine the concept of "promise" a little more closely. According to the Restatement (Second) of Contracts, a promise is a manifestation of an intention to act or refrain from acting. Restatement (Second) of Contracts § 2.[20] The Restatement of Torts states that a promise automatically includes an assertion that the party making the promise intends to fulfill it. See Restatement § 530, comment c. In fact, this assertion of intent to act in the future is the *sine qua non* of a promise. According to the Restatement, then, a promise to repay a debt is nothing more or less than an assertion that one has the present intention to repay that debt in accordance with the terms of the overall agreement. Black's cites the following definition for promise: "Promise is an undertaking, however expressed, either that something shall happen, or that something shall not happen, in the future." Black's Law Dictionary 1092 (5th Ed.1979).

This understanding of a promise as an expression of an intent to act (or refrain from acting) is supported by the non-legal authorities, as well. From Webster's we find "an assurance that one will or will not do something," Webster's II New Riverside Dictionary 941 (1984); and "a declaration that one will do or refrain from doing something specified," Webster's Ninth New Collegiate Dictionary 941 (1990).

All of these definitions use words like "shall" or "will" or "declaration" or "intention." They make clear that such a manifestation of intent to do something (a promise) is the exact equivalent of declaring: "I *will* do it." Some other courts show that they have an improper understanding of the concept of intent.[21] They equate an intent to do something with a hope to do it or a belief that it can be done. Because a correct understanding of the concept of intent is often crucial to properly deciding cases of this type, the court will linger here for a few minutes, to make sure that it understands what it means to intend something, or to say "I will do it," or "I promise to do it."

There are several ways to approach the question. Initially, one observes that the following hierarchy of statements can be constructed:

I will do it.

I expect to do it.

I may do it.

I can do it.

I believe I can do it.

I hope I can do it.

I don't think I can do it.

I can't do it.

I won't do it.

As we descend the ladder, we, as observers, are less and less convinced that "it" will occur. Now, a question presents itself: Which of these statements (substituting "repay the money" in place of "do it"), if any, will be legally sufficient to consummate a loan? What does a lender need to hear

---

Paxon has been severely eroded in the modern world of credit transactions and the decision has been the subject of much criticism." In *Matter of Wood*, 571 F.2d 284 (5th Cir.1978), the court again referred to the fact that *Davison–Paxon* had been criticized. In neither opinion did the 5th Circuit rely on *Davison–Paxon*, but in neither opinion did the court see fit to do away with it. One could guess that the court's reluctance was due in part to the fact that the Bankruptcy Act, which *Davison–Paxon* purportedly interpreted, was still in effect at the time of both *Boydston* and *Wood*. Now, as we've described, the holding of the case has been superseded by the passage of the Code, and its rationale has been rejected (or at least circumvented) by Congress and the Su-

preme Court. We can only hope that the next time the Fifth Circuit gets the chance, it humanely destroys this poor, old, worn-out, and wrong opinion.

**20.** The rationale that led the Supreme Court in *Field v. Mans* to rely on the Restatement of Torts applies equally to this court's endeavor to understand the nature of "promise," and justifies the court's decision to turn to the Restatement of Contracts.

**21.** See, e.g., *In re Rembert*, 141 F.3d 277 (6th Cir.1998); *Citibank v. Michel*, 220 B.R. 603 (N.D.Ill.1998); *In re Scocozzo*, 220 B.R. 850 (Bankr.M.D.Pa.1998).

before handing over the cash, if that lender wants to be a lender under a loan contract rather than an unwitting benefactor? Only the first statement on our ladder ("I will repay") will suffice, and even then only if the statement is made in such a way (with consideration) that it becomes legally binding. No lender would be so foolish as to have a borrower sign a contract that said "I hereby expect to repay this money," or "I believe I will repay it," and/or "I hope to repay this money," or "I can repay this money," or even " I truly believe, hope, and expect that I can and will repay this money." The reason such an action would be foolish is that the lender would have given his money to the "borrower" without any reciprocal obligation. The "borrower" hasn't promised to do anything, and hence isn't a borrower at all.

Now, we have seen that a promise is a manifestation of one's intent. If the borrower in our example isn't really a borrower because he hasn't promised to do anything, then it follows that the borrower's statements of expectation, of hope, and of belief do not constitute expressions of intent. The fact that expressions of hope or belief do not constitute expressions of intent is further supported by reference to the dictionary. Webster's II New Riverside University Dictionary (1984) offers the following definitions: Intend—To have in mind: plan. Hope—To wish for something with expectation of its fulfillment. Believe—To expect or suppose. As we have already seen, the statement "I expect/hope/suppose that I will pay" is not at all the same as " I will pay." When a debtor promises to repay, thereby manifesting the debtor's intent, the debtor says " I will pay."

So why do some courts act like a statement of hope or of belief is sufficient to establish intent? We suggest that it is because these courts have been seduced by the lure of the objective/subjective debate, and have hence been led off the path.

This court has had some trouble following the objective/subjective debate, but after close study of the matter, and at the risk of getting ahead of itself, the court is prepared to draw some tentative conclusions. The debate started when a few courts, particularly Judge Paskay in the Middle District of Florida, started analyzing the debtor's ability to pay as a means of determining the debtor's fraudulent intent. The idea behind this "ability to pay" analysis is apparently that a hopelessly insolvent debtor who, while hopelessly insolvent, goes and borrows more money, must have fraudulent intent because any fool would know that there was no way he could repay the money he just borrowed. This line of reasoning has a long history,[22] and is generally sound (as stated), but in some opinions it seems the courts may have taken things one step too far. The fact that these courts overlook is that it is theoretically possible that, in any given case, the debtor was completely unaware of the fact that he was hopelessly insolvent, actually thought that he could repay the money, and intended to do so (perhaps, even, the debtor is a

---

**22.** Both Restatements, Second and First, have a comment after § 530 that suggests a debtor's insolvency as a method of proving that the debtor had fraudulent intent. See Restatement § 530, comment d, and Restatement (1938) § 530, comment c. For those who assume that this is merely another case of the drafters of the Restatement attempting to change the law rather than restate it, we cite *California Conserving Co. v. D'Avanzo,* 62 F.2d 528 (2nd Cir.1933) (Judge Hand states that a buyer who knows he is insolvent deceives the seller as much as one who intends to avoid repayment); *Manly v. Ohio Shoe Co.,* 25 F.2d 384 (4th Cir.1928) (equating knowledge of one's own insolvency with intent not to pay); *Gillespie v. J C Piles & Co.,* 178 F. 886 (8th Cir.1910) (a buyer who knows he is insolvent is conclusively presumed to have bought with an intention not to pay—a persuasive presumption of intent to defraud arises if he is so insolvent that no rea-

sonable chance of paying existed); *City of Southport v. Williams,* 290 F. 488 (E.D.N.C.1923), aff'd. by 298 F. 1023 (4th Cir.1924).

The Bankruptcy Court for the Western District of New York has attempted to distinguish Judge Hand's opinion in *California Conserving Co.* on the ground that (to paraphrase) the nature of the modern credit card transaction makes it impossible for a lender to justifiably rely on representations of intent to pay without first conducting a credit check. As we will see, this is an incorrect statement of the legal standard involved. It confuses the existence of a fraudulent misrepresentation with reliance on that misrepresentation. *California Conserving Co.* makes just as much sense now as it did sixty-five years ago. A "buyer" who knows he can't pay when he promises that he will pay is committing fraud. Whether the seller or lender will be able to establish justifiable reliance should be a separate inquiry.

certifiable fool).[23] Such a debtor could not have committed fraud, because he actually had the intent he claimed to have. At the very least, those courts that have focused on ability to pay should ask themselves whether there is any evidence that the debtor *knew* he was hopelessly insolvent.

These "ability to pay" courts have also sometimes fallen into the trap of interjecting into the transaction an "implied representation of ability to pay."[24] We discuss this more fully below, but can say here that the problem of dressing up and sending into the analytical fray an implied representation of ability to pay is several fold. First, it doesn't happen (therefore it must be implied). This is much different from the promise or statement of intent that we have discussed, which does, in fact, happen as an integral component of the agreement and need not be implied, in any sense.[25] Second, it is not necessary to the confection of the agreement. Third, if anything, such a representation would constitute a statement respecting the borrower's financial condition, which, because it is implied (and therefore not written), would not be actionable under the provision expressly dealing with statements respecting financial condition, § 523(a)(2)(B). Interjection of the implied representation of ability to pay, therefore, insures that the analysis that follows roughly approximates the consequences of taking a typing test while beginning on the wrong keys. One might make words, but only by accident.

As is often the case in debates of this type, the courts that oppose the "ability to pay" courts have gone to the other extreme, probably as a response to the "implied representation of ability to pay" problem. Most of these opinions follow a pattern. First, the court cites a few examples of the approach it labels "objective," which are opinions that either interject the implied representation of

ability to pay, or focus exclusively on the debtor's ability to pay (or both), and overlook the debtor's state of mind. Then, the court rejects this "objective, reasonable man standard" in favor of a "subjective" approach that purportedly focuses on the individual debtor's actual state of mind. This is all well and good, and we agree that the individual debtor's actual state of mind should be our focus. The problem with most of the courts that talk of "subjective" intent is that they seem to be saying that the debtor's testimony is the only way to establish his intent;[26] but not only that, they also misconstrue the sort of testimony that will actually go toward establishing a debtor's intent. If the debtor can take the stand and say with a straight face "I really meant to pay it back, and I always thought I could get back on my feet," the court will proclaim him to be a "credible witness" and an "honest but unfortunate debtor." Then the court will pat the debtor on the back, declare the debt dischargeable, and grant the debtor's § 523(d) motion (or drop really broad hints that one should be filed immediately).

There are two ways these "subjective" courts go astray. The first is that they are so caught up by the idea of "subjective" intent that they overlook one of the basic (unwritten) rules of evidence. That rule is that no defendant is going to take the stand and testify against himself. Every debtor in a § 523(a)(2)(A) action involving cash advances is going to say that he intended to repay the money. Given that this is an inflexible rule of nature, the fact that one particular debtor in one particular case adheres to the rule doesn't establish the debtor's intent. If a court seriously advocates the position that any evidence of the debtor's intent other than the debtor's testimony is "objective" and therefore objectionable, then

**23.** In fact, as we will see in our discussion of Mr. Melancon's position, it is more than theoretically possible.

**24.** See, e.g., *In re Wong,* 207 B.R. 822 (Bankr. E.D.Pa.1997); *In re Van Dyke,* 205 B.R. 587 (Bankr.W.D.Mo.1997); *In re Choi,* 203 B.R. 397 (Bankr.E.D.Va.1996); *In re Flynn,* 184 B.R. 8 (Bankr.E.D.N.Y.1995); *In re Hale,* 139 B.R. 41 (Bankr.M.D.Fla.1992).

**25.** The promise may be inferred from conduct, but it is not "implied."

**26.** See, e.g., *In re Acker,* 207 B.R. 12 (Bankr. M.D.Fla.1997); *In re Kitzmiller,* 206 B.R. 424 (Bankr.N.D.W.Va.1997); *In re Fulginiti,* 201 B.R. 730 (Bankr.E.D.Pa.1996).

that court is effectively creating a per se rule of dischargeability.

Most courts don't go quite that far. Instead, they fall into the second "objective/subjective" trap. They lose sight of the fact that the transaction was based on a promise, and that a promise is much more than a statement of hope or belief. They are so concerned about divining the debtor's true state of mind that they forget to compare that state of mind with the one that is legally permissible. Instead, they allow any indication that the debtor has some positive personality traits (he hoped to repay his debts; he believed (however unreasonably) that he would be able to repay his debts; the debtor is a credible witness; the debtor is articulate) to persuade them that he is entitled to the ubiquitous "fresh start." [27]

Rather than get trapped in the objective/subjective debate, this court will stick with the guide that the Supreme Court has provided: the Restatement.[28] As we stated above, the Restatement indicates that a promise to pay is a statement of intent to repay that should be interpreted as "I will pay" rather than " I hope I pay" or "I want to pay" or "I believe I can pay." This distinction will have great significance later on.

### Fraudulent Misrepresentation of Intent

■ Now that we have established that use of a credit card to obtain a cash advance does constitute a representation, and now that we have established the content of that representation (I promise to repay the mon-

ey I have borrowed from you/ I *will* repay), the next step is to determine under what circumstances a representation of intent constitutes a fraudulent misrepresentation. The Restatement provides a rule for determining when a misrepresentation is fraudulent. Restatement § 526 states:

A misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of his representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies.

We will be concerned with Restatement § 526(a). A representation is fraudulent if the maker knows that it is false. Here, we are dealing with a representation of intent. It should be obvious that a person will always know his present intentions. Restatement § 530(1) recognizes that fact, and creates a specific rule for representations of the maker's intent. It states:

A representation of the maker's own intention to do or not to do a particular thing is fraudulent if **he does not have that intention.**

The rationale for this rule is clear. If one asserts the intent to do something, but does not· have that intention, then two things follow. First, the assertion is false. Second, the person asserting the intention knows that the assertion is false, since one always knows his present intentions.[29] Therefore, whenev-

**27.** We do not mean to say that hope, belief, expectation are irrelevant to the question of intent; only that they are not, simply by being present, dispositive. Now, if a debtor has no hope, doesn't believe that payment (fulfillment of the promise), or has no expectation, then, pretty clearly, there can be no *intent to fulfill the promise*. However, while belief, hope, expectation may well be necessary to a finding of intent to fulfill the promise, they do not *establish such intent*, because they are not synonymous with intent.

**28.** Although the Restatement is our guide, and we are following that guide as closely as we can manage, we must note that we are not relying on the Restatement's definition of "intent." The word "intent" is used throughout the Restatement to denote that the actor desires to cause the consequences of his act (one that did occur), or

that he believes that the consequences are substantially certain to result from it. Restatement § 8A. Generally, in a tort case, one is attempting to prove (or disprove) that the defendant intended the actual consequences of a known action, while the defendant claims that he did not. In *this case, the court is attempting to determine* whether the debtors did or did not have an intent that they claimed to have. Because of this change in emphasis, the Restatement's definition of intent is not very useful for our purposes.

**29.** Opinions such as *In re Anastas*, 94 F.3d 1280 (9th Cir.1996), *that speak of a debtor's* "reckless disregard" for the truth or falsity of his statements, apparently overlook this fact. One is never mistaken concerning one's intent. If one misrepresents his intent, that is an intentional misrepresentation, not a reckless or negligent one.

er one represents his own intention falsely, he knows that the matter is not as he represents it to be, and this constitutes a fraudulent misrepresentation under Restatement § 525(a). Thus, in representations involving intent, two of the three components of a fraudulent misrepresentation are merged. Whenever a representation of the maker's intent is false, it is also fraudulent (because of the knowledge of its falsity while the representation is being made). Restatement §§ 525 and 530 are consistent in their treatment of the misrepresentation of one's intentions, since one who misrepresents his own intentions necessarily knows that the matter is not as he represents it to be.

### Establishing Fraudulent Misrepresentation of Intention to Repay

We have now established that the use of a credit card to obtain a cash advance is fraudulent whenever the party using the card does not have a present intent to repay the money. (This is, of course, quite different from suggesting that one has fraudulently misrepresented intention to repay if there is no intent to repay presently. It is the intention to repay—within the terms of the borrowing—that must be present at its expression. We mention this here because there are actually courts which strongly suggest that no one can rely upon an expression of intention to repay an extension of credit because the need for credit establishes the inability to pay—and thus repay. Of course, this suggestion reads § 523(a)(2) out of the Code.)

How does a court determine the presence or absence of such intent? Most courts (other than the most subjective of the "subjective" ones) have relied on one of various competing lists of nonexclusive factors to guide their examination of the debtor's intent. This court has found tests consisting of five, six, seven, eight, nine, eleven, and twelve factors.[30] We are tempted to fashion a ten-factor test in order to satisfy our senses of aesthetics and balance (and for mathematical ease—six out of ten and you're dead). We will resist this temptation, as well as the (weaker) temptation to rely on any of the previously constructed lists. Such lists, although always labeled "non-exclusive," tend to monopolize one's attention. The court prefers to rely on a more holistic, intuitive approach, guided by its familiarity with the facts of the case and the individuals involved. Although the court will doubtless consider some of the indicators that appear on the various lists, it would be inappropriate to pre-judge cases by adopting any set of factors which, although "non-exclusive," would exclusively govern future actions challenging the dischargeability of credit card debt.

Mrs. Melancon stated, through her use of the credit card to obtain a cash advance, that she intended to pay the money back. As we've discussed, this statement is equivalent to an assertion that she would repay the money. It is imperative to note that we are not trying to determine, with the advantage of hindsight, whether repayment was likely to occur, or whether a reasonable person in Mrs. Melancon's position would have had that belief. Our point here is to point out that, while we are (as we must be) concerned with Mrs. Melancon's actual state of mind at the time she took the money, we will not be satisfied with an indication that Mrs. Melancon hoped for, or believed in, circumstances that would allow repayment. The foregoing seems to this court to be a great deal more than most courts have expected of debtors.

Remember that we start with a statement of an intention to repay money. Webster's defines "intention" as "a plan of action: design." Webster's II New Riverside Uni-

---

**30.** Five factors: *In re Parker,* 59 B.R. 721 (Bankr. D.Mass.1986); *In re Shrader,* 55 B.R. 608 (Bankr.W.D.Va.1985). Six factors: *National Bank of Commerce v. Lazar,* 192 B.R. 161 (W.D.Tenn.1995); In re Davis, 42 B.R. 611 (Bankr.E.D.Va.1984). Seven factors: *National Bank of Commerce v. Lazar,* 192 B.R. 161 (W.D.Tenn.1995); In re Davis, 42 B.R. 611 (Bankr.E.D.Va.1984). Eight factors: *In re Senty,* 42 B.R. 456 (Bankr.S.D.N.Y.1984); *In re Johnson,* 40 B.R. 756 (Bankr.D.Minn.1984). Nine factors: *In re Cruz,* 179 B.R. 975 (Bankr.S.D.Fla. 1995). Eleven factors: *In re Hunter,* 210 B.R. 212 (Bankr.M.D.Fla.1997); *In re Rivera,* 151 B.R. 602 (Bankr.M.D.Fla.1993). Twelve factors: *In re Dougherty,* 84 B.R. 653 (9th Cir. BAP 1988), and any of the hundred cases that cite it or use the same test.

versity Dictionary 635 (1984). It is insufficient for a debtor to simply state that he always planned to pay the money back "somehow" (we have a mental image of cash suddenly falling from the skies, like manna from heaven). If the debtor has no idea how the money will get paid back, or if it will get paid back, then he may hope to repay—he may even want to repay—but he certainly does not intend to repay.

A further distinction must be drawn here. Some courts have indicated that a creditor, in order to prevail, must prove that the debtor intended to avoid repayment of the money he borrowed.[31] This is an incorrect statement of the applicable legal standard. The creditor need not prove the existence of a scheme to avoid repayment. He is required to prove only that the debtor did not have the intent to repay. There is a significant difference between an intent to avoid repayment and a lack of intent to repay. If we imagine a debtor who, at the time he borrows money, has no idea whether he will be able to repay his debts, but will be quite happy to repay them if things happen to work out so that he can, under the first standard—"intent to avoid repayment"—his debt will be dischargeable. Under the correct standard, the one dictated by the Restatement and sanctioned by the Supreme Court in *Mans*, this debtor has committed a fraudulent misrepresentation and his debt is not dischargeable.[32]

█ The distinction just discussed bears additional significance. A few courts have addressed what might be termed the "mental block" defense, in which debtors have claimed that they were incapable of forming what they termed the "necessary fraudulent intent" because of an uncontrollable addiction to drugs, alcohol, or some form of mental illness.[33] This defense might have some legal validity under the "intent to avoid repayment" standard, if it could be established that the illness or addiction somehow pre-

---

**31.** *In re Hashemi*, 104 F.3d 1122 (9th Cir.1996); *In re Kramer*, 38 B.R. 80 (Bankr.W.D.La.1984).

**32.** Although we believe that this distinction is a significant one, and that we are correct in making it, we are constrained to point out that we are probably in the minority in doing so. The only authority we could find that explicitly draws a distinction between the two formulations is Note, 24 N.C. L.Rev. 49 (1945), which states "fraud may be predicated on promises with an intention not to perform the same, or on promises made without an intention of performance." Most authorities seem to treat the expressions "intends not to perform" and "does not intend to perform" as identical. For example, the Restatement itself says in § 530 that the representation of the maker's intention is fraudulent when the maker does not have that intention. The expression "does not have that intent" includes the situation in which the maker has an intent opposite to that which he represents himself as having, but it also includes the situation in which the maker has *any* frame of mind other than that which he represents himself as having. Contradicting the broad inclusive nature of the textual language, the title to comment d of § 530 is "Proof of intent not to perform," which includes only the first of the two possibilities set forth above. Similarly, the Fifth Circuit, in *U.S. v. Shah*, 44 F.3d 285, 291 (1995) says (in a criminal case, rather than the civil context we are faced with) "It is not breaking a promise that exposes a defendant to criminal liability, but making a promise with the intent to break it." Thereafter, the Fifth Circuit drops the "intent to break" language in favor of "without any intention of

performance." *Id.*, at 292, 293. Several law review articles cited in the Restatement (and roughly contemporaneous with the original Restatement of Torts, from which most of the language in the Restatement (Second) is derived) treat the terms as identical. See, e.g., Note, The Legal Effect of Promises Made With Intent Not to Perform, 38 Columbia L.Rev. 1461 (1938), the title of which includes the phrase "Intent Not to Perform," and the first sentence of which includes the language "without any intention of performing." Id. Alternatively, see Note, Promises Made Without Intention to Perform, 2 Okla. L.Rev. 365 (1949), which has "Without Intention to Perform" in the title, and "intent not to perform" in the second paragraph of the article. Id. See also, W. Page Keeton, Statements of Intention, 15 Texas L.Rev. 185 (1937). *Despite the fact that we are alone* (with the exception of a couple of anonymous Tar Heels) in making the distinction between an intent not to perform and no intention of performing, we are convinced that there is a difference, that it is crucial to the determination of this case, and that the broader meaning of the second phrase is required by the Restatement. The Restatement says that a representation of intent is fraudulent when the maker does not have that intention. "Does not have" is much broader than "has the opposite of."

**33.** *In re Harris*, 210 B.R. 617 (Bankr.M.D.Fla. 1997); *In re Falcone*, 208 B.R. 671 (Bankr. N.D.Ohio 1997); *In re Borste*, 117 B.R. 995 (Bankr.W.D.Wash.1990); *In re Quick*, 70 B.R. 562 (Bankr.S.D.Cal.1987); *In re Vegh*, 14 B.R. 345 (Bankr.S.D.Fla.1981); *Matter of Banasiak*, 8 B.R. 171 (Bankr.M.D.Fla.1981).

vented the formation of a specific intent to defraud. However, under the correct "did not intend to repay" standard, such defenses are completely unavailing. No specific intent to avoid payment is required. The only frame of mind that the creditor must establish is the absence of the intent that is supposed to be present, that is, the intent to repay. Whenever the creditor establishes the absence of such intent, he has, without more, proven the existence of a fraudulent misrepresentation.

### *What about ability to pay?*

■ We have designated "Ability to Pay Courts." We find within these opinions two basic problems. First, these courts have stated that proof of an inability to pay, sometimes coupled with a finding that the debtor knew or should have known of this inability, is sufficient to establish fraudulent intent. (*See, e.g., In re Wong*, 207 B.R. 822 (Bankr. E.D.Pa.1997); *In re Van Dyke*, 205 B.R. 587 (Bankr.W.D.Mo.1997); and *In re Hale*, 139 B.R. 41 (Bankr.M.D.Fla.1992) (or any of a dozen other opinions authored by Judge Paskay that say the same thing.)) This is incorrect. We are not concerned with what the debtor should have known, or what a reasonable man would have known. We are concerned with an actual debtor's actual state of mind.[34]

■ Second, some of these courts have held that the use of a credit card to obtain goods or a cash advance carries with it an assertion that one has the ability to repay the debt thus incurred. Whether this assertion exists or not (it, by definition, must be implied, and we have stated above that it does not, in fact, exist), is irrelevant. An assertion of ability to repay is a statement regarding financial condition, and § 523(a)(2)(A) bars consideration of such a statement. (*Field v. Mans*, 516 U.S. 59, 66, 116 S.Ct. 437, 441, 133 L.Ed.2d 351 (1995); *In re Kaspar*, 125 F.3d 1358, 1362 (10th Cir.1997); *Palmacci v. Umpierrez*, 121 F.3d 781, 789 (1st Cir.1997); *In re Candland*, 90 F.3d 1466,

1471 (9th Cir.1996)). Another thing. Even if the action was one under § 523(a)(2)(B), the oral statements would not be admissible, would not form the ground of recovery. Section 523(a)(2)(B) requires that the statement forming the basis for the action be in writing. So, the "ability to pay courts," to the extent they have found and interjected within the transaction an implied representation of ability to pay, have created the problem of constructing as a (the) ground of their decisions excepting debts from discharge one that is irrelevant to the action brought, and is not even to be considered within the action (§ 523(a)(2)(B)) for which it might be relevant.

■ The problems generated by the "ability to pay courts" do not, however, preclude consideration of ability to pay as a factor in determining the debtor's intent regarding the cash advances. We think it essential to consider the debtor's ability to pay in cases of this type, because proof of inability to pay, not standing alone, **but combined with proof of the debtor's knowledge of that inability**, will often be the only method available for a creditor to make its case.

■ Again we resort to the Restatement: The intention of the promisor cannot be determined by proof of nonperformance. The intention not to perform may, however, be established by circumstantial evidence, such as the fact that the obligor had insufficient funds to carry out the agreement.

Restatement § 530, comment d. We think it important, also, to mention the Reporter's Notes to § 530, comment d. Leading off the discussion is the following:

> When a promise is made in good faith, with the intent to perform it, the fact that it is subsequently broken does not make it fraudulent and gives rise to no cause of action in tort. Therefore the mere breach of a promise is not enough in itself to establish the fraudulent intent. The fraudulent intent may, however, be proved by

---

**34.** Some courts have criticized the position that the position taken in *Wong*, et al., on the ground that these cases use an "objective" standard of intent, while the proper standard is a "subjective" one. See, e.g., *In re Totina*, 198 B.R. 673 (Bankr.E.D.La.1996); *In re Murphy*, 190 B.R. 327 (Bankr.N.D.Ill.1995).

circumstantial evidence. Thus an intent not to pay for goods purchased may be shown by the promisor's insolvency.

Reporter's Note to Restatement § 530, comment d (citations omitted). We differ from the Reporter in one respect. To be more precise, we would have made clear that proof of the promisor's insolvency must be accompanied by proof of the promisor's knowledge of that insolvency.

Prior to the Restatement, as mentioned above, a number of cases dealt with the evidentiary relevance of insolvency, some going so far as to utilize a conclusive presumption of fraud when promises are made in the face of (and with knowledge of) hopeless insolvency, some using merely a presumption of fraud, some using insolvency as a most relevant piece of evidence of the debtor's intent to abide by the promise or lack of intent to provide by the promise. See, e.g., *California Conserving Co. v. D'Avanzo*, 62 F.2d 528 (2nd Cir.1933); *Manly v. Ohio Shoe Co.*, 25 F.2d 384 (4th Cir.1928); *Gillespie v. Piles*, 178 F. 886 (8th Cir.1910); *City of Southport v. Williams*, 290 F. 488 (E.D.N.C. 1923), aff'd. by 298 F. 1023 (4th Cir.1924). This line of cases has been sanctioned by the Restatement's comment, quoted above. We repeat, this line of cases has been sanctioned by the Restatement Comment and Reporter's Notes. We utilize no implied representation of ability to pay. We ask not whether the debtor *should have known* of the debtor's inability to pay. We ask (as the Restatement provides we should) whether the debtor was insolvent, could pay, and then we ask whether the debtor knew that payment could not be made.

These cases are based on the following reasoning: If a debtor is hopelessly insolvent, he may or may not know that he is. If he does not know, then he can, in good faith, borrow money and promise to repay that money, even though it is actually impossible for him to do so. Such a debtor is not committing fraud. He is simply wrong. On the other hand, a debtor who is equally insolvent, and is fully aware of his financial position, cannot possibly be in good faith when he promises to repay a new debt. He already knows that it is impossible. One cannot in-

tend to do something that one knows to be impossible. The point is well made by the court in *Gillespie*. We quote at length:

It is contended, and it is conceded, that the insolvency of a purchaser does not prove his intent not to pay for the goods which he buys. Many an insolvent obtains goods on credit with the honest intent to pay for them, and many times he succeeds in doing so. It is probable that Hough ... bought and paid for hogs whose purchase price was more than $1,200,000 while he was insolvent, and he undoubtedly intended to pay ... by buying and selling the hogs of other vendors and appropriating their proceeds to make the payments, in the hope that the market would change and the losses he was constantly sustaining would change to profits. As long as vendors would sell to him and the bank would honor his drafts, such an intent was possible ...

But he was not in the same financial or mental condition when he purchased of the interveners that he had occupied when he bought of earlier vendors. When he made the earlier purchases he had a reasonable expectation that he could pay for the hogs he purchased with the proceeds of hogs of later vendors in the way in which he had paid for other purchases for months. But when he bought of the interveners **he knew that he had no money or credit** with which to pay for their hogs, that the only way in which he could pay for them was by the purchase and the sale of the hogs of subsequent vendors and the appropriation of the proceeds of these later purchases through the bank to the payment of the interveners. *891 and **he knew that he could not pay** for them in that way because subsequent vendors would not sell to him after his known failure, and the bank would not take his drafts or honor his checks.

In this state of the case it is incredible that he intended to pay for these hogs when he bought them. He knew it was impossible for him to pay for them, and the human mind is so constituted that it cannot harbor a serious intent that the being it directs shall do that which it knows it is impossi-

ble for it to accomplish. An insolvent buyer, who knows at the time of his purchase that his financial condition is such that it is and will be impossible for him to pay for his purchases, is conclusively presumed to have bought them with an intention not to pay for them.

*Gillespie,* 178 F. at 890–91 (emphasis added). The reasoning in *Gillespie* is just as sound and authoritative today as it was ninety years ago.[35] The case provides an example of how a debtor can be exculpated, though insolvent, and shows how insolvency coupled with knowledge is, in most instances, determinative. If a debtor knows that he is hopelessly insolvent, and that he cannot repay the money he is borrowing, it is not possible for that debtor to intend to repay. If he says that he does, then he is (actually) misrepresenting his actual intent. In this respect, the relevance and usefulness of evidence regarding ability to pay should be obvious.

In many cases, sufficient circumstantial evidence will exist to allow the court to draw an inference that the debtor was, in fact, unable to pay his debts. As the *Gillespie* court recognized, and as the Restatement's Reporter recognized, this fact standing alone does not establish fraud. The "ability to pay" courts are wrong in assuming that it does. However, inability to pay coupled with proof of the debtor's knowledge of inability to pay is sufficient to establish fraud.

The "subjective" courts, on the other hand, when (hypothetically) confronted with *Gillespie,* would respond that regardless of the inherent soundness of the opinion's analysis, the Code has made it obsolete because § 523(a) bars consideration of ability to pay for any purpose whatsoever. This position is also wrong. Nothing in the Code bars consideration of ability to pay as circumstantial evidence of intent. The only thing that the Code bars is an action based on an unwritten statement of financial condition. This is not such an action. Neither, when properly understood, is any action based on failure to repay cash advances.

Therefore, the court will maintain its focus on the debtors' intent to repay, but will (properly, we think) consider ability to repay to the extent that it sheds light on that intent. We will try to avoid the error of the "objective" courts, which is to rely solely on such evidence. We will try to avoid the error of the "subjective" courts, which is to bar any mention of ability to pay as an incorrect, objective focus.

### Causation

The second element of the tort of fraudulent misrepresentation is causation. Section 525 of the Restatement refers to two different types of causation. The first concerns the alleged tortfeasor's reason for issuing the misrepresentation. According to the Restatement, he must make the misrepresentation "for the purpose of inducing another to act or to refrain from acting in reliance upon it." The second part of the causation element is causation in fact. In other words, the misrepresentation must cause the damage suffered by the victim, because he did, in keeping with the intent of the tortfeasor, rely on the misrepresentation. These two aspects of causation will be discussed in turn.

The first aspect of causation concerns the debtor's intent, but not in the same sense as that word was used in our discussion concerning the existence of a fraudulent misrepresentation. Here, we are not concerned with determining whether or not the debtor intended to pay back the money borrowed. Rather, at this stage of the analysis, we assume he did not intend to pay the money back, and ask "Why did the debtor fraudulently misrepresent an intent to repay the money?" The answer is obvious. The debtor's purpose in using the ATM was to obtain the money from the creditor. Since the use of the ATM is, by prior contractual arrangement, the act that constitutes the representation, it follows that the representation is

---

35. We offer a couple of minor tweaks to appease the modernists among us. We decline to adopt the "reasonable expectation" language, not because we think the *Gillespie* court was incorrect, but because we think it could be misconstrued as suggesting that a debtor could be found to have committed fraud if his expectation was not reasonable. Second, we decline to adopt usage of "conclusively presumed," just because we do. In fact, however, as we have said, one does not have the intention to do something he knows, factually, to be impossible.

made for the purpose of causing the creditor to provide a cash advance. Since all ATM transactions are of this type, this element of the tort will invariably be present in cases involving credit card cash advances.

The second aspect of causation bears slightly more discussion. Here we are talking about causation in fact, as defined in Restatement § 546. That section provides:

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss suffered by one who justifiably relies upon the truth of the matter misrepresented, if his reliance is a substantial factor in determining the course of conduct that results in his loss.

While the first element of causation required that the card holder intend that the representation of intent to repay would have an influence on the card issuer's actions, this aspect of causation requires that the representation actually have that influence. In other words, misrepresentation causes the creditor's loss if and only if the misrepresentation is a substantial factor in determining the creditor's decision to give money to the card holder.

We acknowledge that there is a distinction between "his reliance is a substantial factor" and "the misrepresentation is a substantial factor." The term "reliance" is not defined in the Restatement. In fact, the Restatement's treatment of the issue is generally not very good. Title D of Division Four, Causation, seems to refer the reader back to Title C. Justifiable Reliance, for an explanation of what is meant by "reliance." But Restatement § 537, which sets forth the general rule that justifiable reliance is necessary, refers the reader to Restatement § 546, which pronounces the general rule of causation without ever defining "reliance." This circular reasoning (or lack thereof) does little to answer the question before us, which is "Under what circumstances can it be said that the misrepresentation causes the issuer's loss?"

The comments to the various Restatement sections offer some slight guidance. Comment a to Restatement § 537 says that the issuer can recover "if he in fact relies upon the misrepresentation in acting or in refraining from action, and his reliance is a substan-

tial factor in bringing about the loss." This is simply a paraphrase of the text of Restatement § 546. Comment b to Restatement § 546 states, in part "It is not even necessary that he [the issuer] would not have acted or refrained from acting as he did unless he had relied upon the misrepresentation. It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision." The first quoted sentence is reminiscent of the "but-for" causation standard familiar to first-year law students throughout the country. The gist of this comment is that the Restatement does not require that X must be a "but-for" cause of the injury. It is enough for the plaintiff's case if X is a substantial factor in influencing his decision.

What is X? There are two candidates. The first, mentioned in the first quoted sentence, is the plaintiff's reliance on the misrepresentation. The second, featured in the second sentence, is the misrepresentation itself. This court cannot distinguish a significant difference between a requirement that the misrepresentation be a substantial factor in influencing the plaintiff's conduct and a requirement that the plaintiff's reliance on the misrepresentation must be a substantial factor. Obviously, the misrepresentation will be a substantial factor only if the plaintiff assumes that the matter represented is true, and acts or refrains from acting because of (or at least in part because of) that assumption. The reliance will be a substantial factor only if the action taken as a result of the statement has something to do with the loss that serves as a basis for the complaint. The concepts are closely related, and it appears that the Restatement treats them as interchangeable.

Although the use of language is poor, and "reliance" remains undefined, the court gleans from the Restatement's repeated use of the words "rely," "in fact," and "substantial factor," each in close proximity to the others, that the drafters of the Restatement were attempting to say that a misrepresentation is a cause-in-fact of the recipient's injuries if and only if the misrepresentation was a substantial factor in the decision-making process that triggered the course of action

(or inaction) that resulted in the loss. Furthermore, whenever the misrepresentation is a cause-in-fact, it must be true that the recipient relied upon the misrepresentation.[36]

█ So, while the language of Restatement § 546 is unclear and ambiguous, the court has resolved the ambiguity by referring to the comments. We conclude that Restatement § 546 creates the following rule: If the misrepresentation plays a substantial role in the issuer's decision-making process, and the result of that process is a course of action (or inaction) that results in a loss, then the misrepresentation is a cause-in-fact of the loss, and the recipient relied upon the misrepresentation.

Now, remember that the misrepresentation we're discussing is the holder's statement that he will repay the money that he takes from the ATM. Is the creditor's reliance on this statement of intent a substantial factor in determining whether or not the creditor will provide the money? It is, on two different levels. First, the issuer would certainly not loan money to someone who disclosed the fact that he did not know when or if he would ever pay the money back. In this sense, the promise to repay is not merely a substantial factor in determining whether a loan will be made. It is an essential element of any loan.

Second, remember that the promise to repay is a component part of the request for a loan, and that the request for a loan is, through contractual arrangement, communicated to the issuer/lender through the mechanical medium of the ATM. The contractual understanding between the parties creates a situation in which a purely non-verbal action of pushing buttons on a key-pad carries with it a non-verbal request for a loan, which in turn contains a non-verbal promise to repay. On a purely physical level, the course of action that causes the issuer's loss is the pushing of buttons, combined with the internal actions of the ATM. But these physical actions must be understood within the context of the contractual arrangement that makes them meaningful. Pushing random buttons or putting the wrong card in the machine won't generate any money. It is only through prior arrangements (the assignment of a card to the holder, the choice of a PIN, the operation of the network, the provision of ATMs in convenient locations) that the transaction works at all, and part of this prior arrangement is the understanding that the physical act of pushing the buttons will carry with it some unverbalized statements that have legal significance. To attempt to separate the communicative aspects of the transaction from the purely physical aspects is a vain and useless enterprise. The physical cause of the issuer's loss is the pushing of the buttons, and the pushing of buttons is, in this context, fraudulent misrepresentation of a promise to repay.

█ Therefore, since we know that a holder represents his intent to repay when he takes a cash advance from an ATM, we can conclude that the representation is made with the intent to cause an issuer to provide cash (Why else would the holder push the buttons?), and that it is a substantial factor in the issuer's determination to provide the cash to the card holder. The fraudulent misrepresentation is therefore, in all cases of this type, a cause in fact of the issuer's decision to engage in the course of conduct, providing

36. I am not claiming that the two ideas—cause-in-fact and reliance—are equivalent. The claim is that a finding of cause-in-fact-ness (using the substantial factor test) mandates a finding of reliance, because the misrepresentation can never be a substantial factor if the recipient does not rely on it. However, it is easy to think of a situation in which the recipient relies on the misrepresentation, but the reliance has nothing to do with his loss. Example: John tells his neighbor Frank that the fish are really biting in Lake James. John knows that Frank is an avid fisherman, and will drive out to Lake James on early Saturday morning in reliance on John's statement. John also knows that the fish aren't biting. He tells Frank they are because he plans to steal Frank's valuable stamp collection Saturday while Frank is gone. John later has a change of heart, and decides not to steal anything. While Frank is at Lake James, (a secluded and generally crime-free spot) a completely unrelated third party reaches through the open window of Frank's car and steals some cash from the glove compartment. Frank has relied on John's fraudulent misrepresentation, but neither the misrepresentation nor his reliance on it were substantial factors in determining the course of conduct (the third party's invasion of Frank's car: Frank's failure to lock the car) that resulted in his loss.

money to someone who does not intend to pay it back, that results in its loss.

### Justifiable reliance

The third element that the credit card issuer must establish is its justifiable reliance on the cardholder's misrepresentation. This issue has troubled the courts that have been faced with actions involving dischargeability of credit card indebtedness.

The most important thing to bear in mind when considering the creditor's reliance is this: What is it that the creditor has to prove that it relied upon? The creditor's burden is to prove that it relied upon **the debtor's misrepresentation**. In cases of this type, that misrepresentation is invariably one of intent, i.e., "I intend to repay the money I am borrowing." The focus is, and should always be, on the time the debtor took the cash advance. It may help to think of the reliance issue as a two part inquiry: 1) was there reliance in fact upon the debtor's misrepresentation? 2) If there was reliance in fact, was that reliance justifiable?

 Section 537 of the Restatement sets forth the general rule that the creditor must rely on the debtor's misrepresentation, and further states that the creditor's reliance must be justifiable. We've already pointed out, in the previous section, that a finding that the misrepresentation is a cause-in-fact of the loss necessitates a finding that the recipient of the misrepresentation relied upon it. Since the misrepresentation is, in transactions of this type, always a cause-in-fact of the creditor's loss (since it is inseparable from the physical act that causes the creditor to provide cash), we can conclude that the issuer relies on the holder's promise to repay whenever it provides the requested cash.[37] The real issue is whether, in a given case, that reliance is justifiable.

Early decisions interpreting § 523(a)(2)(A) demanded that the creditor prove reasonable reliance. The *Mans* opinion informed lower courts that the proper standard for actions under § 523(a)(2)(A) was justifiable reliance, rather than reasonable reliance. In some cases, the lower courts appear to have responded to this change by deleting the word "reasonable" from their old opinions and inserting the word "justifiable." They still require the same investigations, the same credit checks, and the same proof that the credit card companies are not forcing helpless debtors into unwilling and unwitting spending frenzies. See, for example, *In re Alvi*, 191 B.R. 724 (Bankr.N.D.Ill.1996).

Fortunately, the Restatement does much more for us than simply declare that the issuer's reliance must be justifiable. It also explains what it means by "justifiable reliance." Section 538(1) of the Restatement provides that reliance on a fraudulent misrepresentation is not justifiable unless the misrepresentation is material. Restatement § 538(2)(a) says a matter is material if a reasonable man would think it was an important factor in deciding his course of conduct. We saw in our discussion of causation that the representation of intent to pay was a component of the transaction itself, since a loan is not a loan without a promise to repay. If the representation is a necessary part of the transaction, then we can certainly conclude that it is material.

 This conclusion does not end our inquiry. We have determined that the issuer relies on a material statement when it relies

---

37. A few opinions, e.g., *In re Hernandez*, 208 B.R. 872 (Bankr.W.D.Tex.1997); *In re Christensen*, 193 B.R. 863 (N.D.Ill.1996), *In re Alvi*, 191 B.R. 724 (Bankr.N.D.Ill.1996), state that the "passive extension of credit" cannot be considered reliance at all. These opinions offer no reasoning to support their conclusion that proof of the provision of money to a borrower in the consummation of a loan is anything other than proof of reliance on the borrower's promise to repay. One wonders how a lender could possibly be said to have relied upon a promise to repay money if the lender had never given any money in the first place, or, conversely, how a lender who lends money through an ATM could be said not to rely on the borrower's use of the ATM when making its decision to lend. The machines don't just randomly spew cash. Apparently, these courts are suggesting that reliance-in-fact carries with it some sort of requirement that the reliance meet a court-sanctioned, court-created standard of commercial reasonableness/justifiableness/appropriateness. This court rejects those opinions, and agrees (in this respect only) with *In re Carrier*, 181 B.R. 742, 747 (Bankr.S.D.N.Y.1995) when it states: "The issuer's extension of credit constitutes both actual reliance and damages."

on a statement of intent to repay, but that alone is insufficient to constitute justifiable reliance. What else is needed? Many courts require a credit card issuer to demonstrate that it conducted an examination of the card holder's credit history before issuing the card.[38] While such a requirement may have been permissible prior to the Supreme Court's opinion in *Mans* (we offer no opinion on this), it is no longer permissible, because it flatly contradicts the rule set forth in the Restatement, which the Supreme Court has identified as the law to be applied in cases of this type. Section 540 of the Restatement states:

> The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation.

Thus we see that there is no duty to investigate, and that justifiable reliance can occur even in the absence of a simple investigation that would allow the recipient of the misrepresentation to easily prove or disprove its truth.[39] The illustration provided by the Restatement is particularly relevant:

> A, seeking to sell land to B, tells B that the land is free from all incumbrances. By walking across the street to the office of the register of deeds in the courthouse, B could easily learn that there is a recorded and unsatisfied mortgage on the land. B does not do so and buys the land in reliance upon A's misrepresentation. **His reliance is justifiable.**

Restatement § 540, Illustration 1 (emphasis added). This illustration involves a situation in which A makes a misrepresentation of fact that could easily be verified by B. B is under no duty to do so, and his failure to walk across the street and conduct a simple investigation is no bar to recovery. In our case, the misrepresentation is one of intent, rather than fact, and cannot be independently verified or disproven, except through circumstantial evidence. Some courts would require an issuer to gather circumstantial evidence such as credit reports or account history, then analyze the evidence to determine whether or not the holder really intends to do what he says he intends to do (pay his debt). This is a much more difficult investigation than the one facing B, the buyer in our illustration. The difficulty is compounded when one considers that B was only buying one tract of land, while the smallest of credit card issuers operates thousands of accounts. If the Restatement does not require B to cross the street, it certainly doesn't require these issuers to hire additional staff to continuously conduct credit checks and analyze account information (presumably on a loan by loan basis, if the original agreement—after the extensive credit checks, etc., required by these courts—checks out).

Those courts that would impose such a burden on card issuers are effectively stating their dislike for the way these companies conduct their business. They are saying that issuers should not be so eager to hand out credit cards.[40] The Eleventh Circuit has

---

**38.** See, e.g., *In re McCreery,* 213 B.R. 689 (Bankr.N.D.Ohio 1997); *In re Ellingsworth,* 212 B.R. 326 (Bankr.W.D.Mo.1997); *In re Etto,* 210 B.R. 734 (Bankr.N.D.Ohio 1997); *In re Hernandez,* 208 B.R. 872 (Bankr.W.D.Tex.1997); *Household Credit Services, Inc. v. Walters,* 208 B.R. 651 (Bankr.W.D.La.1997); *In re Kitzmiller,* 206 B.R. 424 (Bankr.N.D.W.Va.1997); *In re Alvi,* 191 B.R. 724 (Bankr.N.D.Ill.1996); *In re Gelagay,* 187 B.R. 15 (Bankr.M.D.Fla.1993).

**39.** It is impossible to reconcile Restatement § 540, which clearly states that a creditor can prevail in an action for fraudulent misrepresentation without conducting any investigation at all, with cases like *Etto,* which declares "banks have a responsibility to conduct reasonable investigation of a debtor's finances prior to extending loans," 210 B.R. at 740, or *Alvi,* in which the court states "A creditor cannot sit back and do

nothing and still meet the standard for actual and justifiable reliance when it had an opportunity to make an adequate examination or investigation." 191 B.R. at 731. Both of these cases were published well after *Mans.* Given the fact that justifiable reliance is defined by the Restatement to exclude any duty to conduct an investigation, and given the fact that the United States Supreme Court has stated that the Restatement's definition of justifiable reliance should govern cases of this type, we cannot perceive the basis for these courts' assertions.

**40.** See, e.g., *In re Ellingsworth,* 212 B.R. 326 (Bankr.W.D.Mo.1997); *In re Etto,* 210 B.R. 734 (Bankr.N.D.Ohio 1997); *In re Chinchilla,* 202 B.R. 1010 (Bankr.S.D.Fla.1996) (refers to the hypocrisy of credit card issuers in general); *In re McDaniel,* 202 B.R. 74 (Bankr.N.D.Tex.1996) (in which the court refers repeatedly to "commercial

even stated that the issuer, by issuing a card, automatically assumes the risk that a holder will use a card with no ability to repay the debt thus incurred, and no intent to do so, and that the issuer must absorb any loss that occurs before it revokes the card.[41] This court does not believe it has the authority to tell an entire industry how to conduct itself. Congress, if anyone, has power to legislate concerning the availability of credit cards. If it chooses not to do so, then this court must assume that Congress has made a conscious decision that the status quo is acceptable. This court's function is to apply the law as it stands. That law states that there is no duty on the part of a recipient of a misrepresentation to investigate whether the statement is true or false. There is simply no legal basis for requiring a credit check, certainly not before the issuance of the card.

 The fact that there is no need for a credit check does not mean that the issuer will always be found to have justifiably relied on the holder's representation. Restatement §§ 541 and 544 provide additional rules for determining whether reliance is justified. Restatement § 541 states that a recipient of a fraudulent misrepresentation is not justified in relying on its truth if he knows that it is false or if its falsity is obvious to him. Thus, if an issuer acquires knowledge that makes obvious the holder's lack of intent to repay, the issuer cannot recover on an action for fraudulent misrepresentation for any

money loaned after the acquisition of the knowledge that should have caused the issuer to act.

What knowledge would make such a lack of intent obvious? Some examples might be helpful here. Suppose an issuer started mailing "pre-approved" applications to death row inmates. It is obvious that most death row inmates have limited incomes (and limited life expectancies), and it is also obvious that they are much less likely than members of the general population to repay their debts. These facts combine to make it obvious that one who receives a credit card while on death row has no intent to repay any charges made, and that any representation to the contrary is false.

Another example involves placement of the lender's ATMs. Many of the cases under § 523(a)(2)(A) involve gambling losses. In some of the cases, the cash advance was actually made inside the casino.[42] See, e.g., *In re Crutcher*, 215 B.R. 696 (Bankr.D.Tenn. 1997). If a lender allows a holder to borrow money inside a casino, then the lender must be charged with two bits of information: the money will be used for gambling, and either the borrower has been losing or he has no money of his own with which to gamble. In those circumstances, the lender would face a difficult challenge in establishing that its reliance on a promise to repay was justifiable.[43]

entrapment"—one is left with the impression that a credit card issuer should be held strictly liable for the damages it causes to people by lending them money, though we have been unable to figure out who we would tell the issuer to pay, to rectify these damages); *In re Fulginiti*, 201 B.R. 730 (Bankr.E.D.Pa.1996) (stating that credit card issuers were responsible for debtor's financial problems). Basically these courts have performed a broad-based cultural brain operation on people who borrow money with credit cards, effectively removing those parts of their brains that make them responsible human beings. Thereby, the great unwashed are granted their pardons by the all-seeing, who, in so doing, are simultaneously consigning these people to existence in the realm of the childlike, blessed in their ignorance and inability to interact responsibly. We simply aren't so wondrous.

**41.** *First National Bank of Mobile v. Roddenberry*, 701 F.2d 927 (11th Cir.1983).

**42.** A creditor that lends money inside a casino is not justifiably relying on anything, and should not be able to recover. Unfortunately, courts that focus on the practices of credit card companies in issuing cards, or find that ATM transactions do not involve representations, or rule in favor of a debtor because he says he believed he would win and hoped to be able to repay with his winnings, are playing into the hands of the creditors' lobby. By focusing on the wrong issues these courts risk allowing the credit card issuers to shift the attention of Congress away from their ill-advised lending practices, such as placing ATMs in casinos, and toward the widely held belief that debtors are abusing the system, and that the Code needs to be changed to prevent that abuse.

**43.** Members of the creditors' bar may ask us to observe that a single lender often has little control over the placement of ATMs. That fact fails to outweigh the obvious stupidity of an institutional policy that sanctions the decision to lend

Two more examples come from the jurisprudence. In one case, *In re Hunter*, 210 B.R. 212 (Bankr.M.D.Fla.1997), the credit card issuer, First USA Bank, had sued Hunter under § 523(a)(2)(A). One week before trial, First USA sent an offer to upgrade Hunter's account and send him a new "Platinum" card. If Hunter had accepted the new solicitation and used the card for charges or cash advances, then knowledge of the obvious falsity of his statement of intent to repay would necessarily have been imputed to First USA, since it had previously sued Hunter for his alleged misrepresentation of intent to pay. Any time an issuer gives a card to a holder with whom it has previously had trouble, the justifiable nature of the issuer's reliance on the holder's promise to repay is subject to serious doubt.

*Crutcher*, cited above, involved a debtor with a severe gambling problem. She had refinanced her house several times to pay gambling debts, and was under psychiatric care. In April 1995, she telephoned her credit card issuer, informed it of her gambling problems, and requested that her card be canceled and never reinstated. Four days later, she called to have her card reinstated. The issuer complied with her request, and Crutcher withdrew $9000 in cash advances in 24 hours, all of which were taken from ATMs inside casinos, and all of which she lost gambling. The court correctly denied relief to the creditor, since the falsity of the debtor's statement of intent to repay had been made obvious by her confession that she had a serious gambling problem.

These examples illustrate how a card issuer can, without conducting an investigation, learn information that would render unjustifiable any reliance on a card holder's representation of intent to repay. Simply by administering the account, the issuer acquires certain information about the card holder, including at a minimum, the holder's address and payment history. The issuer also knows certain things about the way it conducts business, including the location of the ATMs in its networks. If the information acquired by the issuer is sufficient to render obvious the fact that the holder does not intend to repay his debt, then the issuer is not justified in relying on representations to the contrary in extending further credit.

Section 544 of the Restatement provides that if the statement relied upon is one of intention, as it is in this case, then it must be material. Furthermore, the recipient must have reason to believe that it will be carried out, given the circumstances surrounding the transaction. We have already discussed the materiality of the statement of intent to repay, pointing out that in a loan, the statement of intent to repay is not simply material, but is a crucial component of the transaction. Therefore, the only thing we need now consider for purposes of Restatement § 544 is whether the issuer has reason to believe that the card holder will repay the cash advance, given the circumstances surrounding the transaction.

In this part of our inquiry, it is important to realize that most credit card holders pay their bills. Bankruptcy courts are accustomed to dealing with the minority of Americans who do not pay their debts, and this fact inevitably colors their perceptions.[44] The truth is that while bankruptcy filings continue to rise, it is not yet the norm in this country for debts to be discharged in bankruptcy. According to published statistics, credit card companies write off as uncollect-

money in a casino to borrowers who gamble and are willing to do so with somebody else's money. If a small credit card issuer has insufficient leverage to insure that it will not be making loans in casinos, it has three options: to get out of the credit card business, to get its holders to sign agreements indicating that they understand the use of the card inside a casino is strictly unauthorized (which may or may not have any legal effect), or to be prepared to lose a certain percentage of its cases brought under § 523(a)(2)(A).

44. It has apparently caused some bankruptcy courts to reach the dangerous conclusion that the average debtor is an incapable, unreliable, and dishonest person who should be considered a ward of the court, and whose promise no reasonable lender would give any credence. This is a paternalistic attitude which we reject, as a general proposition, reserving of course the prospect of determining, **with respect to the debtor's intent**, the extent to which the debtor understood his financial situation and, with respect to justifiable reliance, with what information the creditor should be charged.

ible roughly six percent of their outstanding balances each year. *In re Ellingsworth,* 212 B.R. 326, 330 (Bankr.W.D.Mo.1997). While this may seem like a high percentage, it indicates that about fifteen out of every sixteen credit card debts in a given year are being paid in a satisfactory manner. Furthermore, according to the same source, the total credit card debt in this country in 1995 amounted to $367 billion. Of that total, six billion dollars was discharged in bankruptcy. That is about one and a half percent. We are not prepared to offer an opinion concerning whether these numbers are commercially reasonable, since that isn't our job, but we are prepared to say that they do not coincide with the picture of rampant, unrestrained, and completely irresponsible lending practices that has been painted by some courts. See *Ellingsworth.* They certainly do not justify those courts in their decision to ignore the Supreme Court's chosen source of law, the Restatement of Torts, and require lenders to assume the burden of insuring that they do not lend to people who falsely represent their intent to repay the money they borrow.

Since the issuer has no duty to investigate, Restatement § 540, the issuer need not establish that an investigation into any particular holder's credit history gave it reason to believe that the particular holder would repay. Rather, the issuer need merely establish that the evidence before it would allow a reasonable lender to conclude that this account was like most of the other accounts, and that there was no particular reason to think that this holder wouldn't repay. This standard of justifiable reliance is similar to the "red flag" analysis used by the Ninth Circuit in a series of opinions including *In re Hashemi,* 104 F.3d 1122 (9th Cir.1996); *In re Anastas,* 94 F.3d 1280 (9th Cir.1996); and *In re Eashai,* 87 F.3d 1082 (9th Cir.1996).

The "red flag" terminology can be traced to the earliest of these three decisions, *Eashai.* There, the Ninth Circuit was faced with a situation in which the debtor had been engaged in a long term "credit card kiting" scheme, by which he was able to incur over $100,000 in credit card debt, apparently without ever making any payments with real money. 87 F.3d at 1085–86. Eventually the scheme collapsed, and Eashai filed a bankruptcy petition. Citibank filed an adversary proceeding, seeking to have its portion of the credit card debt excepted form discharge under § 523(a)(2)(A). The court discussed the nature of justifiable reliance (after pointing out that it had been using the justifiable reliance standard long before the Supreme Court's decision in *Mans* ), and concluded that the creditor was justified in relying on the debtor's apparent intent to pay as long as the account was not in default. *Id.,* at 1082. The court went on to say:

> If the creditor had warning that the debtor's account was in danger of default, the creditor will not be able to establish justifiable reliance. We will not allow a creditor, who has been put on notice of the debtor's intent not to repay, to extend credit and then later claim nondischargeability on the basis of fraud. Unfortunately, the true deceit of kiting is that by making minimum payments the debtor almost guarantees that his account will never raise a red flag.

*Id.* The Ninth Circuit confirmed its understanding of the nature of justifiable reliance when it cited *Eashai*'s "red flag" rule in *Anastas,* 94 F.3d at 1286, and again in *Hashemi,* 104 F.3d at 1126. The court recognized that although there is no duty to investigate, a creditor must be held to be aware of the information that comes into its possession. If a creditor conducts a credit check that turns up negative information, or if the debtor has a poor account history, or if, as in *Crutcher,* supra, the debtor calls the creditor and says "please don't give me any more money, because I'm a compulsive gambler," then the creditor ignores these warning signs at its peril.

This "red flag" standard encapsulates the rules created by the Restatement in its presentation of justifiable reliance. If an issuer puts on sufficient evidence to establish that the holder's account was normal, that there were no facts that would render obvious the holder's lack of intent to repay, and that it was free of the warning signs that the Ninth Circuit has labeled "red flags," then the issuer has established that its reliance on

the holder's representation of intent to repay was justified.

### Damages

The fourth and final element of the tort of fraudulent misrepresentation is damage. The creditor must prove that it suffered a loss. Here, it is not disputed that Mrs. Melancon took cash advances totaling $7889, and that LA Cap provided them. If LA Cap can establish the other elements of its claim, it will recover damages equal to its loss, together with such contractual remedies as it may be entitled to. Restatement § 549.[45]

### Now, what about this case?

The debtors' position can be summarized as follows: First, gambling is legal in Louisiana and Mississippi, so the fact that the cash advances were used for gambling should not be held against Mrs. Melancon. Second, although the debtors concede that they were "not very likely" to be able to repay the cash advances, the debtors' ability to repay their debts "is not a proper consideration in a case such as this." Third, cases such as *Davison–Paxon v. Caldwell*, 115 F.2d 189 (5th Cir. 1940) *First National Bank of Mobile v. Roddenberry*, 701 F.2d 927 (11th Cir.1983), and *GM Card v. Cox*, 182 B.R. 626 (Bankr. D.Mass.1995), make it clear that the credit card issuer can never prevail in a dischargeability action, because the issuer cannot establish the existence of a representation (*Da-*

*vison–Paxon* ), there is no justifiable reliance (*Roddenberry* ), and the complaint raises facts that were never meant to be addressed under § 523(a)(2)(A) (*Cox* ). Furthermore, while the debtors are mutually liable for all community obligations, a determination of non-dischargeability due to the actions of one spouse should in no way affect the dischargeability of the same debt with respect to the other spouse. Finally, the debtors invoke their right under § 523(d) to costs and attorney fees for being forced to defend this action, which they claim was not substantially justified.

The debtors are correct that gambling is legal (though the state legislature, in Louisiana at least, has determined that because it shall seek out and suppress gambling, certain forms of gambling should be called "gaming," and, as such, do not constitute gambling). The court does not draw any inferences of non-dischargeability solely from the fact that the money was ultimately used for that purpose. Nevertheless, the fact that Mrs. Melancon is a gambler, with a history of gambling, and that all the money (for practical purposes) spent in connection with this and her other cash advances was spent gambling does play a significant role in determining her frame of mind when she took the money from the ATM, as will be discussed later.

As we've shown, the debtors are simply wrong when they say that ability to pay is not a factor to be considered in this case.[46]

---

**45.** This element receives little discussion, because we all know that the creditor suffers damage when the debtor fails to repay a cash advance. But see *In re Shaw*, 172 B.R. 665 (Bankr. M.D.Fla.1994), where the court found (we do not know how) that the issuer had failed to establish that it had suffered a loss.

**46.** Some courts have put forth the sophistic argument that consideration of ability to pay when determining intent is inappropriate because "if the debtor had the ability to pay, he would not need credit at all." *In re Briese*, 196 B.R. 440 (Bankr.W.D.Wis.1996); *Matter of Ford*, 186 B.R. 312 (Bankr.N.D.Ga.1995). There are several things wrong with this "argument." Among them: It should be obvious by now that we are concerned with the debtor's state of mind at the time of the transaction. For the reasons we have set forth, a debtor does (in fact) represent that he has the intent to repay any money he borrows. If, for example, a debtor is aware that he has no

ability to repay, and never will have that ability, then he does not have the intent to repay. One cannot intend to do something that one, at the moment of purportedly formalizing the intent, knows or believes to be impossible. So, to say that ability to pay is not relevant to the issue of intent is simply wrong. Next, we are obviously not concerned with the debtor's present ability to repay all debts in full with cash on hand. The issue is (we thought this was obvious) the ability to meet one's obligations as they come due. Finally, the position that these courts maintain is essentially that a present inability to pay is always a defense to a fraud action. If that were true, only those debtors with sufficient cash on hand to pay all of their debts in full at the time each is incurred would ever have a debt excepted from discharge under § 523(a)(2)(A). The problem: there are no such debtors. This is a bankruptcy court. People with enough money to pay all of their debts do not file bankruptcy petitions. Reading a section out of the Code, however, does

Section 523(a)(2)(A) does not preclude consideration of ability to pay in determining whether the debtors have committed fraud. It creates a rule that a statement concerning ability to pay cannot be considered as the basis for an action under the subsection. This is an important distinction. This court makes no finding concerning whether Mrs. Melancon's use of the Visa constituted an assertion of her ability to pay back the money she spent. Such a finding would be an irrelevant one grounded in inadmissible evidence. Hopefully, we are not that bad at our job.

The focus is on her promise/representation that she intended to pay it back. Ability to pay is relevant, since Mrs. Melancon's ability to pay (together with her knowledge of that ability) provides evidence of her intent.

The Melancons rely primarily on three cases. The court has already discussed the first, *Davison–Paxon*, and concluded that the publication of *Mans* renders *Davison–Paxon* no longer applicable to actions under § 523(a)(2)(A). Furthermore, *Davison–Paxon* attempted to find a distinction between false representations and/or pretenses, on the one hand, and fraud, on the other. There is no longer a reason to make such a distinction, since § 523(a)(2)(A) now includes all three, and they are all governed by the same legal standards.

The next case relied upon by the debtors is *Roddenberry*, an Eleventh Circuit case that applied the old Bankruptcy Act. There, the court was faced with a situation in which the debtors ran up charges of $1600 on a credit card with a limit of $1000. From the period April 1978 until October 1978, the issuer conducted ongoing negotiations with the Roddenberrys in an attempt to get them to bring their balance below the credit limit. 701 F.2d at 928. In September, the Roddenberrys separated, and Mrs. Roddenberry kept the card, *Id.* From September to November, she took $1300 in cash advances from a local ATM. Finally, in December, the bank revoked the card, and demanded its return. Thereafter, Mrs. Roddenberry continued to use the card, but she no longer took cash advances. Instead, she made small purchases at local retail stores, and sold the goods that she bought for cash. By keeping the amount of goods purchased in a single transaction under $50, Mrs. Roddenberry took advantage of the then-common retail practice of honoring cards for small purchases without any verification of the validity of the card. By the time the Roddenberrys filed their bankruptcy petition in March of 1979, the balance on the card was over $7000. Mrs. Roddenberry continued using the card post-petition, and did not surrender it until some time later on 1979. *Id.,* at 929.

The Eleventh Circuit determined that only those charges incurred after the card was revoked would be excepted from discharge. The court stated:

> The element of risk is inherent in the issuance of bank credit cards. Our 'credit-card economy' encourages widespread voluntary risk-taking on the part of those issuing cards.... Indeed, banks have a definite interest in permitting charges beyond established credit limits because of the high finance charges typical in such transactions. Banks are willing to risk non-payment of debts because that risk is factored into the finance charges. Because the risk is voluntary and calculated, § 17a(2) should not be construed to afford additional protection for those who unwisely permit or encourage debtors to exceed their credit limits.

*Id.* at 932. It should be clear from the quoted language that the Eleventh Circuit was concerned primarily with what it perceived to be the creditor's faults, rather than the debtor's conduct, which was the subject of § 17a(2) and is the subject of § 523(a) (at least until you get to the reliance component). Nothing in § 523(a)(2)(A) gives this court or any other the authority to tell credit card issuers how to conduct their business, or to second-guess their risk-taking strategies, except to the extent that the Restatement requires their conduct to comply with what it calls "justifiable reliance." [47] This

---

generate at least one silver lining—fewer lawsuits.

**47.** In fact, isn't one of the functions of any interest payment the recognition and amelioration of

court will not sanction the Eleventh Circuit's decision to impose burdens on lenders beyond those contained in the Bankruptcy Code. We are not comfortable with the suggestion that credit card issuers consent to being defrauded, and we do not interpret the business practice of assigning interest rates in accordance with the risks involved as some sort of tacit approval of the fact that an industry-wide category of borrowers will defraud those who lend by means of credit cards. We decline to follow *Roddenberry*.

■ The third case relied upon by the debtors is *GM Card v. Cox*, 182 B.R. 626 (Bankr.D.Mass.1995). In that case, Judge Queenan decided that it was impossible to fit a credit card transaction under § 523(a)(2)(A) for several reasons. First, the law under the Bankruptcy Act did not except from discharge debts of this type. Judge Queenan cited *Roddenberry*, a pre-Code case, in support of this position. 182 B.R. at 631. Next, the Code's legislative history gave no indication that Congress meant to change the law by creating a new basis for excepting a debt from discharge. *Id.*, at 632. Third, the addition of the "actual fraud" language in § 523(a)(2)(A) was not meant to overrule *Davison–Paxon*, but was instead meant to codify the rule than only actual fraud, as opposed to fraud implied in law (for example, in cases involving breach of fiduciary duty) were to be excepted from discharge. For these reasons, Judge Queenan concluded that § 523(a)(2)(C) was the sole remedy for credit card issuers. Alternatively, Judge Queenan stated that the technological innovation of the credit card prevented an issuer from relying on anything that the debtor may represent, so that the fraud action would never be available to a credit card issuer. Judge Queenan dismissed the idea that an issuer relied on the card holder's representation when it provided the service (cash advance or facilitation of sale) that it was obligated by the terms of the credit card agreement to provide as "mere lip service" to the requirement of reliance. *Id.*, at 637.

There are several reasons why the debtors' reliance on *Cox* is misplaced. First of all, the case has subsequently been overruled. *AT&T Universal Card Services Corp. v. Pakdaman*, 210 B.R. 886 (D.Mass.1997), though the district court decision is not binding on this court. Even if *Cox* hadn't been overruled, this court would not follow it. This court disagrees with Judge Queenan concerning the nature of reliance, the persuasiveness of *Roddenberry*, and the role of legislative history in the interpretation of statutes. Furthermore, Judge Queenan's most important conclusion fails to withstand scrutiny. He argues that § 523(a)(2)(C) is the sole remedy for a credit card issuer seeking to have a debt excepted from discharge. However, that section only creates two presumptions. The first pertains to luxury goods or services, and is not relevant here (although it could be argued that gambling is a luxury, that point was not before the court in *Cox*, and is not before this court, either). The second involves cash advances under an open end credit plan, which would include cash advances taken with a credit card. According to subparagraph (C), cash advances taken within 60 days before the filing of the bankruptcy petition "are presumed to be nondischargeable." § 523(a)(2)(C). This is properly viewed as an evidentiary presumption rather than a conclusive one. If a debtor wishes to rebut the presumption of non-dischargeability, he must put on evidence. What sort of evidence would that be? According to Judge Queenan, subparagraph (C) stands alone. If it does stand alone, then the debtor would be required to rebut a presumption of non-dischargeability without the benefit of knowing what law caused the debt to be excepted from discharge. (In other words, there is no substantive ground of discharge set forth, specifically within subsection (c), so that if it

---

various levels of risk? Isn't the Eleventh Circuit saying nothing more than no creditor participating in credit card borrowing agreements can (or should) rely upon a borrower's promise to repay? Why? Why are not all borrowers to be disbelieved? Why are only credit card borrowers not worthy of having their promises relied upon? The Eleventh Circuit, through its announcement of such a paternalistic world view, has indicated that credit card borrowers are to be treated as wards of the (that) court; but, in the manner of all those who use such expressions of paternalism, it has pronounced those borrowers to be irresponsible cheats who in no circumstance can be counted on to mean what they say.

stood alone, the debtor's attempt to rebut the presumption of nondischargeability could only be launched from the substantive platform—"The debt is too dischargeable!" In support of this rebuttal portion of the proceeding, the debtor could only offer testimony such as "I hereby testify that the debt is dischargeable.")

Fortunately, there are indications that the presumption, although termed a presumption of non-dischargeability, is a presumption of non-dischargeability because of the existence of fraud, false representation, or false pretenses. Subparagraph (C) begins with the reference: "For purposes of subparagraph (A) of this paragraph." That fact suggests that the ground for non-dischargeability is the fraud exception (and that subsection B—the false financial statement provision—is inapplicable). Furthermore, subparagraph (C) is a subdivision of § 523(a)(2). That fact indicates that it should be interpreted with reference to the other subparagraphs of paragraph (2). If, as Judge Queenan suggests, the provision was meant to stand alone, then the rules of statute writing would dictate that it be listed as a separate exception to discharge, rather than as a subparagraph of the fraud exception. But, we reiterate, there is no substantive basis on which subsection (c), alone, could conceivably stand.

If we assume that subparagraph (C) creates an evidentiary presumption of fraud, then in order to rebut the presumption, the debtor must put on evidence tending to show that the transaction was not fraudulent. Assuming that the debtor can do it, what happens then? The creditor must still prove his case. The presumption has been rebutted, so subparagraph (C) is no longer relevant. The debtor has simply rebutted a presumption, requiring the creditor to move forward. The creditor must prove his case under subparagraph (A), which is the only legal ground for which the presumption has applicability. The fact that Congress created the presumption of subparagraph (C) is, contrary to Judge Queenan's suggestion, conclusive evidence that credit card transactions *are* covered by § 523(a)(2)(A). *Cox* was wrongly decided, and was properly overruled.

The debtor's last contention involved the separability of the exception to discharge. Debtor's counsel suggests that even if the court finds that Mrs. Melancon's cash advances should be excepted from discharge, Mr. Melancon's liability on the debt should still be discharged. The court agrees, and will phrase its order accordingly.

For its part, LA Cap maintains that the Fifth Circuit's decision in *In re Allison*, 960 F.2d 481 (5th Cir.1992) establishes that it need not prove reliance at all in an action brought under § 523(a)(2)(A). If *Allison* did create such a rule, it has been overruled by the Supreme Court's decision in *Mans*, which held that a creditor must establish its justifiable reliance on the debtor's representation.

In keeping with its position in brief, LA Cap's argument at trial and in briefs focused almost exclusively on the Melancons' ability to pay. LA Cap successfully demonstrated that the debtors had obligations that far exceeded their income, and that they had previously needed to take a second mortgage on their home to pay their credit card bills. The debtors even conceded in their post-trial brief that "their ability to continue payments on the LA Cap Visa was not very likely." LA Cap would have us go directly from this established lack of ability to pay to a finding that the debt is excepted from discharge. This court will not do so. LA Cap must establish, at a minimum, that Mrs. Melancon knew that she was unable to pay her debts. Only then will LA Cap be entitled to prevail on the determinative issue, that of intent.

What can be determined about Mrs. Melancon's intent? All of the debts in question (we are only dealing with the Visa card) were incurred between June 4 and July 17, 1994, and during that time the debtors' financial condition did not change significantly (with the exception of the cash advances at issue). As of June 1, the debtors' outstanding obligations already exceeded their ability to pay. They had recently borrowed $22,000, and had secured the loan with a second mortgage on their home, which was the only asset in their community estate from which payment of any debt could be made, other than future wages, and which was now fully encumbered. There is no evidence of separate

estates existing for either Mr. or Mrs. Melancon. Mrs. Melancon states that she intended to pay the debt associated with the LA Cap Visa. (Mr. Melancon testified that he didn't know the money was being run up, so any suggestion that he shared that intention is disregarded.) The court has already explained that such a statement, standing alone, carries very little weight in determining intent. The court has also stated that a statement of intent (I will repay) is distinguishable from a hope or a desire to repay. An intent to repay suggests a plan to repay. It suggests an anticipated source of funds from which repayment might be made.

It is conceivable that Mrs. Melancon had a plan of repayment, an anticipated source of funds. It is conceivable that she had an incorrect understanding of her financial situation, or that she drew an improper conclusion from the correct understanding of her financial situation. But all of the available evidence suggests otherwise. Mrs. Melancon handled all of the family finances. Testimony at trial showed that she was able to keep her husband completely in the dark about her gambling debts for over a year. Also remember that Mrs. Melancon is a loan officer for a bank. She knows about loans, and she knows what it takes to repay over $7000 in cash advances. She knows what it takes to repay $7000 in cash advances made after other cash advances that have been rolled into a second mortgage on the family home.

The court finds that Mrs. Melancon had an accurate understanding of her financial position, and that she was fully capable of properly analyzing her circumstances to determine whether she could pay additional debts. Given these facts and the fact that the court was presented with no evidence concerning prospects for pay increases, overtime, additional borrowing (refinancing ˙ capability), sources of funds from other sources such as family members (living, about to be dead, already dead), the court concludes that Mrs. Melancon knew that she would not be able to repay the Visa cash advances. Further, there was no attempt by the debtor(s) to cut their losses, by attempting through evidence, including testimony, to establish that while out there somewhere along the cash advance line, Mrs. Melancon became possessed of the knowledge that she would not be able to pay back the advances because she had been unable to rein in her cash advance appetite, there was a portion of the time line within which the advances were reasonable enough that the sources of money available or that she believed would become available could have handled them. Of course, there may be a reason for this failure—recall that the entirety of the money we are concerned with was advanced over a period of about 43 days. We would be hard-pressed to believe that she ever really looked up from her fixation on obtaining loans to believe she was going to pay back. Since she did not believe that she would be able to repay from sources that we have suggested she might have been able to consult within the development of her intention, it follows that, unless there is something we haven't thought of, she did not intend to repay them.

We did forget something. Gambling winnings. Debtors in the credit card/gambling cases have, about unanimously, offered the following: "I believed I was going to pay the money back because I believed, albeit unreasonably (debtor's lawyer intelligent enough to throw the bait, hoping the judge involved will bite at the intelligent-sounding objective/subjective discussion—how does it go? "We find the debtor, *however unreasonably,* believed she was going to win at gambling. Therefore, because it is the subjective intention we are after, the debtor intended to pay back." *See In re Rembert,* 141 F.3d 277 (6th Cir.1998)), that I would win." Of course, only the most self-destructive person would go a-gambling hoping or believing they were going to lose. Hello? Don't all people (except this distressed few) who gamble believe they are going to win, or, at least, break even? Or, put another way, will any bankruptcy judge ever hear the following testimony: "I knew there was no way I was going to win, and I do not believe myself to be overly self-destructive; I simply enjoyed going to the casino (video poker establishment, racetrack, gambling boat, etc.) because they, during certain hours, give you free drinks and food, and I like the flashing bright lights—besides, I feel important when the valet parks my car." Answer, No. We will never

see it. So, where do the courts, who stop asking themselves what to do when the debtor testifies that he believed he was going to win, go wrong?

It appears to us that they go wrong by failing to consider the following line of inquiry. Q. Had you ever won before (over what you borrowed or came with)? A. Yes. Q. What did you do with your money? A. (1) put it back up to try to double it; (2) took it home and saved it until next time; (3) counted it, set it aside, and gambled only a small portion of it while applying the remainder of my winnings to the creditor from whom I borrowed the money. If the answer is (1), the follow-up inquiry is "Did you win more, keep what you had won, lose what you had won, or lose more than you had won?" A. (1) I won more (then we are back to the aforementioned questions); A. (2) I kept what I had won (again, back to the aforementioned questions); A. (3) I lost what I had won (which generates the aforementioned questions regarding the use to which he was to put the amount that constituted the break-even money); A. (4) I lost more than I had won (which generates the follow-up—where did you get the money that you had to bet with after your losses exceeded your winnings?). All of this is a long way of suggesting that before a court believes a debtor who claims to have had a plan to win and use the winnings to pay back the amount borrowed, shouldn't there be evidence—if the debtor ever had won (and what debtor hasn't)—that winnings had been used before? In other words, don't we know that we do not have to believe what witnesses say they believed and hoped just because they say so?

The only conceivable source of income that could have been used to repay these cash advances (since we have been offered no evidence of any other source) was the casino. Mrs. Melancon may have hoped that she would hit the jackpot, winning enough money to pay off all her debts and retire to a life of luxury in the Mediterranean. There are several problems with calling this idyllic scenario a plan to repay. First of all, "winning," the word, is not a plan. Gambling, as we understand it, is a series of actions or interactions, usually involving the debtor and some gambling establishment or machine. Is "winning" the plan? Then, for example, should we hear about the debtor's game(s) of choice, about the system or gambling approach employed, betting strategy, drinking habits while gambling, use of winning, etc? We think so. What about the likelihood, in fact, of winning big, particularly without testimony or evidence as just discussed? If Mrs. Melancon was to use her winnings to pay off the LA Cap Visa, and nothing else, she would have needed to win at least $7500. What is the likelihood of such a sizeable strike? (We suspect even with testimony along the lines mentioned, it is very small.) It is doubtful that such a small likelihood of winning could justify even the hope or belief that some courts find sufficient. It is nowhere near enough to justify Mrs. Melancon's statement that repayment would occur. Another court, faced with a similar situations, said:

> Intent to repay requires some factual underpinnings which lead a person to a degree of certainty that he or she would have the ability to repay. Mere hope, or unrealistic or speculative sources of income, are insufficient.

*In re Clagg,* 150 B.R. 697, 698 (Bankr.C.D.Ill. 1993). The *Clagg* court was faced with a debtor who testified that the only way he had to repay his debts was to win the lottery. Mrs. Melancon probably had a better chance of winning $7500 at the casinos than Clagg had of winning the Illinois lottery, but it was still woefully short of anything that could support her statement of intent to repay. The most likely occurrence was what happened: she lost everything, just as she'd done before.

Let's go a step further, and assume for the sake of argument that Mrs. Melancon was a better gambler than we think, and that she did occasionally hit the big one. Let's assume that she had some reasonable chance of winning enough money to repay the LA Cap Visa debt. If she had won $7500, would she have paid her credit card bill, or would she have done something else?

This is a woman who lost over $60,000 in two years, who ruined her family's finances, mortgaged her house, and used every credit

card she could get, all so she could keep gambling (and she did most of it behind her family's back). Would someone like that take the $7500 she had just won, step back, and say "Well, I'd love to have one last pull of the lever/push of the button/turn of the wheel/roll of the dice/hand, but I think it would be better if I went home and paid my credit card bill." That would never happen. So, we have the ultimate folly inherent in the belief or hope that the debtor would win. Such a belief does not establish that "will win" is synonymous with "will pay." Mrs. Melancon has probably never walked out of a casino with money in her pocket. If she won anything, she would have said "This is it, I'm on a roll." And the roll would have stopped the only way it could have stopped, which is not with the victorious Mrs. Melancon cashing in her chips, but with the dejected Mrs. Melancon saying "Oh, well, maybe next time." (Or maybe "I'll never do this again," but guilt, addiction, a lack of something else in her life, or a need to cover the losses she's already incurred sends her back to more draws on more credit cards which then starts the cycle all over again.) Can we as judges just face it—gambling houses do not pay for all that electricity that keeps all those lights flashing with money they lose to the likes of Mrs. Melancon.

Other courts faced with similar situations have declared gambling debts to be dischargeable. We will only discuss three of them, although there are countless more. The first is *In re Rembert*, 141 F.3d 277 (6th Cir.1998). Rembert lost roughly $20,000 in six months while gambling at a Canadian casino. Apparently, most or all of her cash advances were obtained inside the casino. 141 F.3d at 279. In November of 1994, Rembert took out a second mortgage on her house and used the proceeds to pay off her credit card bills. *Id.* She continued to gamble, and continued to lose. In April of 1995 she filed Chapter 7, and two credit card issuers, AT & T and Citibank, filed adversary proceedings against her under § 523(a)(2)(A). Id.

At trial, Rembert testified that "she believed that she would be able to win enough money to repay her credit card debts." 141

F.3d at 279. Notice please, the Sixth Circuit did not say, Rembert did not say, that she would pay with her winnings, just that she would win enough money to pay her credit card debts. Presumably, without more, this statement could also mean that she believed she would win (enough to pay off her credit card debts) an amount sufficient to stake an even bigger payoff. The bankruptcy court found both debts to be excepted from discharge. The district court reversed, and the Sixth Circuit affirmed the reversal. According to the Sixth Circuit, the issue was whether or not the bankruptcy court improperly applied an "objective" standard rather than the appropriate "subjective" one. The court determined that the bankruptcy court had applied the wrong standard, and then proceeded to apply its version of the "subjective" standard. The court stated:

> We are not unsympathetic to Appellants' claim that a subjective analysis of a debtor's fraudulent intent is extremely difficult to establish. Clearly, debtors have an incentive to make self-serving statements and will rarely admit an intent not to repay. In particular, compulsive gamblers often will have a subjective (albeit often baseless) intent to repay their gambling debts with their "expected" winnings, which is fueled by the very nature of their addictions.

*Id.,* at 282. In this one passage, the Sixth Circuit makes almost every mistake that we mentioned in our discussion of intent. First of all, they get sucked into the "objective/subjective" trap, and seem to think that the only permissible evidence of "subjective" intent is the debtor's testimony. As we have discussed, it is simply wrong to think that circumstantial evidence cannot be used to establish intent. Circumstantial evidence is used to establish intent all the time, in every conceivable context. Second, the court confuses the applicable legal standard. It refers to an "intent not to repay" rather than a lack of intent to repay. Third, the court refers to a "subjective (albeit often baseless) intent."

The context in which the phrase is used (with references to "expected" winnings and addictions) make clear that the court is confusing intent to repay with a hope, a wish, a

desire to repay. As we've discussed, they aren't at all the same thing. Finally, the court's reference to an addiction raises two points. The first is that the court seems to have accepted the "mental block" defense that we mentioned earlier. The fact that the debtor gambles becomes a point in her favor, the more a gambler the better, because (according to the Sixth Circuit) she is overcome by her addiction and cannot form a fraudulent intent, because the very nature of her addiction makes her think that she will win lots of money and (here is the best part) use that money to pay her debts. Of course, what the Sixth Circuit has missed, among other things, is that the more compulsive or addicted the gambler is, the more fervent her hope of winning, and therefore the more solid her intent to repay; but the more addicted she is, the less chance (way below zero) that she would use winnings to repay. Apparently the power of the addiction eases once one wins substantial sums of money (we say apparently because there is insufficient empirical evidence on which to base a conclusion, since this almost never happens). The second problem is closely related to the first. If we assume that the gambler has enough sense to say "I couldn't help it" and "I thought I would win a lot of money," or if the gambler's lawyer has enough sense to tell the gambler to say it, doesn't the gambler always win? Isn't the Sixth Circuit creating a per se rule that gambling debts are dischargeable? Answer, yes.

These same mistakes occur throughout the *Rembert* opinion. "The bankruptcy court erred by considering Rembert's ability to pay." 141 F.3d at 282. In fact, ability to pay is often the most probative evidence of intent to pay, as courts have recognized for at least seventy-five years. There is nothing in the Code that prevents a court from considering ability to pay as evidence of intent to pay. Remember that § 523(a)(2)(A) bars use of a statement regarding ability to pay as a *representation*, not as evidence of the truth or falsity of some other representation, such as "I will pay."

Next, we have "she thought that she would win enough money to pay her debts." *Id.* How do we know that she thought that?

Just because she said so? What debtor in a gambling case is ever going to say anything different? Even if she really did think so, is there any evidence to suggest that she really would have used the money for that purpose? Is "thinking that you will win" the same as "intending to repay"? No.

The most amazing thing about this opinion is that despite all of its errors, it still reaches the right result. These debts should have been discharged, but not for any reason that the Sixth Circuit mentioned. The reason that the exception doesn't apply is that the lenders' reliance was not justified. These cash advances were taken from an ATM *inside the casino*. If AT & T and Citibank want to lend money in a casino, that's their business, but they cannot possibly say that they are justified in relying on the promise of a losing gambler who, the lender should be charged with knowing, has more money with which to gamble and, **while inside the casino**, says "Let me borrow a few thousand dollars and I'll pay you back." (We would relish viewing the attempt to construct a legislative appeal by the credit card industry in the face of a recast of *Rembert* which would conclude that the debtor was clearly fraudulent in her misrepresentation of intent to repay, but that the plaintiffs knew the money borrowed—in the casino—was to be used for gambling by someone who had no more money to gamble. And they believed her?).

Next we turn to *Citibank v. Michel,* 220 B.R. 603 (N.D.Ill.1998). In that case, the debtor was a frequent gambler who, by his own admission, had never left a casino with a profit. 220 B.R. at 604. The bankruptcy court held the $16,800 in cash advances that Michel had taken with his Citibank card to be dischargeable, saying "He had deluded himself into believing that there was a realistic possibility that he would win." *Id.,* at 605. The district court affirmed. At the end of the opinion the district court states that there are two types of gamblers: those who maintain a sincere hope of winning and truly intend to pay their debts if they do win, and those who just want to have fun with somebody else's money. (This is truly divine perception.). The court affirmed the bankrupt-

cy court's determination that Michel fit into the first group rather than the second. *Id.,* at 607.

■ We believe that both of the *Michel* courts exhibited an improper understanding of intent to repay (as we've discussed earlier). The language the courts used is instructive. The bankruptcy court stated that Michel had convinced himself that he had a "realistic possibility" of winning. The district court spoke of gamblers "who maintain a sincere hope of winning." Possibilities and hopes are not enough to support a finding of intent. It is not enough that the debtor hopes to win, or that he thinks he might win. He must intend to win. An intent to win requires a plan to win.[48] It is difficult to imagine a debtor who is a frequent gambler, who has **never** had a successful trip to the casino, and who still thinks that this time he will win (rather than merely hoping he will win, as undoubtedly all gamblers do). The *Michel* courts concluded that a hope of winning is enough. (Once again, the court assumes that winning would lead to payment of debts.) Under that standard, just as in *Rembert,* every gambler (with enough presence of mind to assert a heartfelt hope) will have his debts discharged because they all hope to win.

Finally, we will look briefly at *In re Scocozzo,* 220 B.R. 850 (Bankr.M.D.Pa.1998). There, Judge Thomas takes several courts to task for attempting to impose their morality (thou shalt not gamble) on the debtors that appear before them. 220 B.R. at 851–52. After criticizing the courts who rely on implied representations of ability to pay, he then finds that the gambling debt before him is dischargeable because, in his view, the fact that gambling winnings were the only likely source of repayment was not a ground for excepting the debt from discharge.

This court has already stated, and will now state again, that it is not drawing any inferences of nondischargeability from the fact that Mrs. Melancon is a gambler. In fact, as we think we have shown, it is Mrs. Melancon and courts such as the drafters of *Rembert,*

*Michel,* and *Scocozzo* who draw an irrebuttable inference from the fact that the borrower was a gambler and spent the money gambling—The Gambler Always Wins (unless the gambler and the gambler's lawyer are too stupid to conjure up a "true hope" and avoid being cast upon the pulled-from-the-sky heap of gamblers who, according to *Michel,* just want to have fun with somebody else's money). The issue is whether or not a stated hope or belief that the debtor will win enough money to repay her debts is sufficient to constitute intent to win, and whether an intent to win (if it exists) is equivalent to an intent to repay. Judge Thomas apparently found that on the facts before him, a hope of winning was the equivalent of an intent to repay. We are unable to offer an opinion regarding the propriety of that conclusion (the facts not having been mentioned), but we will observe that, just as in *Rembert,* the debtor in *Scocozzo* borrowed money by using an ATM in a casino. That fact alone would have been enough to find the debt dischargeable, had the court addressed it.

We are not suggesting that a debtor must prevail, if at all, only on the issue of justifiable reliance. If a debtor could establish that, despite all of his previous losses, this time he not only hoped he would win, but was sure that he would win, he would be entitled to a finding of dischargeability. How would a debtor do this? Let's think. Our hypothetical debtor has gambled relentlessly without success; if there were any winnings, there was never enough to make a dent in the borrowing, so it was thought to be better simply to roll it again. The debtor's wife intervenes—"No more," she says. The debtor agrees but begins to make trips to the newsstand or public library where he begins to gather reading material about "systems." He gets addresses and writes off for free introductory offers of "no fail" ways to beat the house. And he studies. And he figures. And he develops his own system that, if rigorously followed, will insure success. He borrows on his card; he plays, following his system to a T. He loses. What about this?

---

**48.** Even with this we are giving the debtor the benefit of a doubt, because we are assuming that an intent to win is equivalent to an intent to repay one's debts with the money won. This is an idealistic assumption, to say the least.

At least the debtor can show a design, a plan by which he wrongly believed it probable that he would win; a plan by which the winnings would be sufficient to repay.

Or, perhaps, the debtor might establish that he had a prior history of paying debts with gambling winnings, see, e.g., *In re Briese*, 196 B.R. 440 (Bankr.W.D.Wis.1996), or *In re Murphy*, 190 B.R. 327 (Bankr. N.D.Ill.1995).

Another hypothetical debtor, knowing that he was playing with borrowed money, knowing he was getting—had gotten—in too deep, shows, for example, that a car loan was about to pay out, freeing up $432.00 per month, and that the minimum monthly payment, even at the maximum credit limit available, would amount to $296.14 per month, leaving $135.86 with which to reduce, monthly, the principal balance (of up to $7,500), thereby freeing up this much available credit per month with which to play the slots. However, unbeknownst to this debtor, his employer is about to embark on a cost-cutting program, cutting out all overtime, and the employer's payment of part of the employee's health insurance. The replacement coverage proves to be an extra $238.00 per month and commences five (5) months before the car loan pays out. The plan goes up in smoke, but there was a plan.

■ We aren't faced with that situation here. The court had ample opportunity to observe Mrs. Melancon's demeanor and make inferences concerning her financial sophistication and her credibility. Mrs. Melancon undoubtedly hoped that she would win, but she did not, as a means of repayment, have a plan to win. Furthermore, we do not think that winning, however unlikely, would have led to repayment. Consequently, despite the fact that she, like all other gamblers, may have hoped that she would win a lot of money, Mrs. Melancon never intended to repay the cash advances. She knew that she wasn't going to win big, or that if she did, she wouldn't stop until all the money was gone. And she didn't care. The only things

that mattered were the need (or desire) to gamble, and the need (or desire) for money with which to gamble.[49] Mrs. Melancon took the money from the teller machine, and in doing so she promised LA Cap that she would pay it back. But she couldn't pay it back, and more importantly, she knew she would not. The court finds that LA Cap has established the existence of a fraudulent misrepresentation.

As previously discussed, the fraudulent misrepresentation was, through prior contractual arrangement, inextricably intertwined with the mechanical process of obtaining the cash from the teller machine. The act of taking the cash advance, which contained the misrepresentation (by constituting the promise to repay, which, was false when made, as per the Restatement), is the same act that caused LA Cap to make give Mrs. Melancon the money she wanted. The court therefore finds that Mrs. Melancon made the misrepresentation with the intent to cause LA Cap to loan her money, and that the misrepresentation was a cause in fact of LA Cap's decision to lend her money, which was the decision that resulted in its loss.

■ LA Cap has also demonstrated that its reliance on Mrs. Melancon's misrepresentation was justifiable. As indicated earlier, this court does not choose to follow the rule espoused by some courts that a creditor must prove it conducted a credit check in order to show that any reliance was justifiable. Such a requirement is inconsistent with the meaning of "justifiable reliance" as set forth in the Restatement.

The fact that LA Cap increased the credit limit on the Visa account from $3000 to $7500 in October 1993 is no bar to a finding of justifiable reliance. At that time, LA Cap had no evidence to suggest that a problem might later develop. Reliance on the Melancons' creditworthiness would have seemed thoroughly justifiable in light of the fact that only a month later they paid the account balance in full. As of June and July 1994,

49. We are not suggesting that this is what a reasonable person in her situation would have thought. We are finding, as a matter of fact, that this is what Mrs. Melancon herself thought. We, like all courts everywhere, base these findings on all of the available evidence, including circumstantial evidence concerning the Melancons' financial condition and Mrs. Melancon's knowledge of that condition.

342

when the cash advances at issue were taken, the information available to LA Cap would have indicated that the account had been paid in full only a few months earlier, and that since that time the balance had been at or near zero. The first occurrence that might have called LA Cap's attention to the fact that there may be a problem with the account was the cash withdrawal on July 17th, 1994, which caused the balance on the account to exceed the available credit. But that was the last time that the card was used, so no action on LA Cap's part would have prevented its loss. LA Cap also established that it knew nothing about Sunburst Bank's second mortgage or Mrs. Melancon's gambling problems.

LA Cap has met its burden with respect to every element of the tort of fraudulent misrepresentation as defined by the Restatement. According to the Supreme Court in *Mans,* that is the appropriate legal standard to apply to the facts of this case. For the foregoing reasons, the court concludes that the debt incurred through the use of the LA Cap Visa to obtain cash advances from teller machines must be excepted from discharge in accordance with § 523(a)(2)(A).

### Mr. Melancon's debt

LA Cap has also asked the court to find that the $5000 loan made to Mr. Melancon must be excepted from discharge, through operation of §§ 523(a)(2)(A) and/or (B). For the following reasons, the court concludes that neither exception applies, and the debt must be considered dischargeable.

■ LA Cap's primary argument concerning this debt concerns § 523(a)(2)(B). That provision requires the debtors' use of a statement in writing. However, the evidence produced at trial demonstrated that the debtors never used a statement in writing. The telephone conversation between Mr. Melancon and an agent of the plaintiff does not constitute a writing used by Mr. Melancon, despite the fact that the bank employee may have prepared a writing based on his oral statements. See *In re Kaspar,* 125 F.3d 1358 (10th Cir.1997). This court is aware of the alternative (and unnecessary) holding of *In re Graham,* 122 B.R. 447 (Bankr.M.D.Fla.

1990), which states that an application by telephone is sufficient to constitute a writing. The court finds that opinion to be in error on the issue, and declines to follow it.

■ Since § 523(a)(2)(B) is unavailable, LA Cap must prevail, if at all, under subsection (A). Mr. Melancon made two statements that have been challenged by LA Cap. The first is the statement concerning the debtors' financial condition. That statement cannot serve as the basis for an action under § 523(a)(2)(A). The other statement challenged by LA Cap concerns the purpose for which the proceeds of the loan would be used. According to LA Cap, Mr. Melancon represented that the proceeds of the loan would be used to purchase an automobile, but he actually used the money for something else. The debtors established that the money was used to cover a check written by Nicole Melancon (presumably the debtors' daughter-in-law) as the down payment for a new Toyota Celica. Defense Exhibits 3, 4, 5. Since the representation was true, it cannot serve as the basis for an exception from discharge. LA Cap also failed to produce any evidence that it relied upon this representation in determining whether it would make the loan. (There was no testimony concerning, for example, the obtaining of a security interest on the car to be purchased.). Katherine Lemelle testified that she required Mr. Melancon to pay $500 toward the balance owed under the Visa agreement, that he did so, and that she then approved the loan. She did not mention that the purpose of the loan had any bearing on her decision, and the fact that she made the loan without verifying that a car had been or would be purchased suggests that there was no reliance on this representation.

These two statements, the one concerning the debtors' financial condition, and the other concerning the purpose of the loan, are the only statements LA Cap relies on in its prosecution of the action against Mr. Melancon. LA Cap did not mention, at trial or in brief, that Mr. Melancon had represented his intent to repay the money he borrowed. As the court has observed several times now, every request for a loan automatically in-

cludes a promise to repay, which is a representation that one has the intent to repay.

 LA Cap didn't mention this third statement, and didn't rely on it in prosecuting its action. The court has determined to consider it anyway, since FRCP 54(c) directs that every final judgment shall grant the relief to which a party is entitled.

By requesting the loan, Mr. Melancon represented his intent to pay the money back. As we've already discussed, he could not pay it back. If the court were to follow the line of cases holding that inability to pay was sufficient, then the debt would be excepted from discharge. However, LA Cap is incorrect in assuming that lack of ability is all it needs to prove. It must show that Mr. Melancon lacked the intent to repay. At a minimum, it must offer some evidence from which the court could draw an inference that Mr. Melancon knew the poor state of his finances, and therefore knew that he could not repay the money he borrowed, and therefore did not intend to do so. LA Cap failed to offer any proof on these issues.

While Mrs. Melancon's financial sophistication and knowledge of the family's financial situation is clear from the record, there is nothing in the record to indicate that Mr. Melancon was either sophisticated or knowledgeable. This difference in frame of mind is the only meaningful distinction between the two debtors. The Melancons were insolvent at the time they incurred each debt. In fact, they were in worse shape in August, when Mr. Melancon asked for his loan, than they were in June and July, at the time that Mrs. Melancon took her cash advances. Insolvency alone, however, doesn't lead to non-dischargeability. While the evidence was sufficient to establish that Mrs. Melancon controlled the family finances, that she fully knew of her insolvency, and that she took the cash advances knowing that she could not (and therefore would not) repay them absent some unexpected change in her luck at the casino, the preponderance of the evidence does not suggest that Mr. Melancon knew what was going on.

The evidence is sufficient to support an inference that Mr. Melancon had no clue how much debt the family owed. Under the cir-

cumstances, the court finds that LA Cap has failed to establish that Mr. Melancon did not plan to repay the loan out of his future earnings, or perhaps with payment assistance from the two for whom the car was purchased. If he did have this plan, then he may have had the intent to repay the loan. If that were the case, then his representation concerning that intent would have been true. Since LA Cap bears the burden of proof on this issue, and LA Cap has failed to prove the existence of a fraudulent misrepresentation, its action against Mr. Melancon must fail. This debt is dischargeable.

### Conclusion

The series of debts incurred through use of the Visa card is excepted from discharge pursuant to § 523(a)(2)(A), as against Mrs. Melancon. The $5000 debt incurred by Mr. Melancon in August of 1994 is dischargeable. The Melancons have requested costs and attorney fees pursuant to § 523(d). Since LA Cap prevailed on one of its claims, the court finds that the complaint was substantially justified, and denies the debtors' request. A separate order will issue.